**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FAMILY EQUALITY; TRUE COLORS
UNITED, INC.; and SERVICES &
ADVOCACY FOR LGBT ELDERS,

             *Plaintiffs*,

        v.

ALEX M. AZAR II, in his official capacity
as Secretary, United States Department of
Health and Human Services; THE UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,


             *Defendants*.

Civil Action No. _____

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### INTRODUCTION

1.      Plaintiffs Family Equality, True Colors United, and Services & Advocacy for LGBT Elders ("SAGE") (collectively "Plaintiffs") bring this action under the Administrative Procedure Act ("APA") to challenge the United States Department of Health and Human Services' ("HHS") unlawful Notice of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63809-01 (Nov. 19, 2019) ("Notice of Nonenforcement"). Issued in November 2019, the Notice of Nonenforcement announced that HHS will not, under any circumstances, enforce 45 C.F.R. § 75.300, which prohibits discrimination based on age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity in grant programs funded by HHS.

2.     HHS administers approximately $500 billion in grants. Those grants fund critically important programs that provide essential health and welfare services to millions of people around the country. Those people include some of the most vulnerable members of our society such as children in foster care, youth experiencing homelessness, and older people. Prior to the November 2019 Notice of Nonenforcement, a uniform and explicit regulatory prohibition against discrimination protected beneficiaries of, and participants in, these programs. As a result of HHS's unlawful decision to abandon enforcement of existing law, HHS sends a message that it intends to protect beneficiaries and participants under only a limited hodgepodge of non-discrimination requirements found in the programs' underlying statutes. That result, in effect, removes critical protections and introduces substantial confusion among grant recipients regarding their legal obligations and the right of the populations they serve to be free from discrimination.

3.     In 2016, HHS revised its grants regulations in order to reflect existing law and previously uncodified agency policy. Among other things, the agency codified a policy that prohibited discrimination on the basis of age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity. Health and Human Services Grants Regulation, 81 Fed. Reg. 89393 (Dec. 12, 2016) ("2016 Grants Rule"). The agency explained at the time that it had already adopted the non-discrimination policy and codified it into regulation for all HHS service contracts under which contractors deliver services for HHS programs directly to the public. HHS stated that, by codifying the same policy in its grants regulations, it made explicit that the provision applied equally to grant recipients. The agency also codified a provision that would implement two Supreme Court decisions regarding the constitutional rights of same-sex couples: *United States v. Windsor*, barring discrimination by the federal government against same-sex

couples under the Fifth Amendment, and *Obergefell v. Hodges*, holding unconstitutional laws barring same-sex couples from marriage under the Due Process and Equal Protection Clauses of the Fourteenth Amendment. Following a comment period that yielded universal support for the proposed non-discrimination provisions, the agency finalized the rule in December 2016 without any changes to those provisions.

4.      Now, several years later, Defendants have, in their Notice of Nonenforcement, unlawfully adopted a substantive rule that guts the anti-discrimination provisions. By categorically refusing to enforce the 2016 non-discrimination regulation, no matter how egregious the discrimination, Defendants have altered the regulatory obligations imposed upon grant recipients. As its sole rationale, the Administration has offered a legally incorrect assertion—that the 2016 rulemaking was likely promulgated in violation of the Regulatory Flexibility Act.

5.      At the same time that it issued the Notice of Nonenforcement, HHS also released a notice of proposed rulemaking that would permanently weaken the anti-discrimination protections. The proposed rule would eliminate the comprehensive and inclusive list of protected classes in the existing rule and leave only those protections that exist in statutes authorizing grant programs. In the accompanying press release, Defendants asserted that the broader purpose for both actions was to "eliminat[e] regulatory burden, including burden on the free exercise of religion," signaling it would allow religion to be weaponized to discriminate against lesbian, gay, bisexual, transgender, queer and questioning ("LGBTQ") youth, families, and older people and ignoring other constitutional constraints on such discrimination.

6.      HHS's actions give recipients of federal funds a license to discriminate in their provision of government-funded services to millions of people. Among those most likely to be

impacted are LGBTQ children and youth. Those children and youth are particularly vulnerable when placed in out-of-home care or while experiencing homelessness, where they are dependent on grantees for care and services. In addition, LGBTQ families interacting with the child welfare system are likely to be subjected to discrimination. Finally, HHS's actions invite discrimination against vulnerable LGBTQ older people who depend on critical aging services to obtain nutrition, address social isolation, and receive holistic care.

7.      The Notice of Nonenforcement is unlawful. Despite the sweeping impact of this substantive rulemaking, Defendants provided no opportunity for public comment. That omission violates their obligations under the APA. The Notice of Nonenforcement is also arbitrary and capricious. The only proffered explanation is an incorrect legal determination that the 2016 rulemaking violated the Regulatory Flexibility Act, which cannot support HHS's action. Finally, the Notice of Nonenforcement is also arbitrary and capricious because Defendants failed to provide a reasoned explanation for their actions and to consider important aspects of the problem, such as the harms that would result from this blanket policy of nonenforcement.

8.      Plaintiffs respectfully request that the Court declare that the Notice of Nonenforcement violates the APA and vacate the Notice.

## PARTIES

9.      Plaintiff Family Equality (previously known as "Family Equality Council") is a nonprofit, nonpartisan organization that is headquartered at 475 Park Avenue South, New York, NY 10016. Founded in 1979, Family Equality's mission is to advance legal and lived equality for LGBTQ families. Recognizing that every LGBTQ person has a right to form and sustain a loving family, and that all children deserve a stable, loving forever family, Family Equality

advances its mission in part by working to ensure that adoption and foster care services, including those funded by HHS grant programs, are free from discrimination.

10.     To further this mission, Family Equality's daily operations include several activities that are relevant here. First, Family Equality conducts outreach and education to LGBTQ families and support groups to ensure that those families understand their rights and are empowered to advocate for themselves. Second, Family Equality works on the federal and state levels to ensure that adoption and foster care services do not discriminate against LGBTQ youth in need of homes or LGBTQ adults seeking to become parents or guardians. This work involves securing affirmative protections at the federal and state level and working to stop or repeal policies that allow for discrimination, such as license-to-discriminate laws that allow providers to discriminate in the name of religion. To that end, Family Equality convenes and co-chairs the Every Child Deserves a Family Campaign, a national campaign of over 500 faith, child welfare, civil rights, LGBTQ, and allied organizations and individuals that come together in an effort to end anti-LGBTQ discrimination in the child welfare system and promote the best interests of all children in the foster care and adoption system by increasing their access to loving, stable forever homes.

11.     Prior to the Notice of Nonenforcement, Family Equality had relied on HHS's 2016 Grants Rule to help ensure that adoption and foster care service providers do not discriminate against LGBTQ youth in the child welfare system or LGBTQ adults who are potential foster or adoptive parents. For example, Family Equality has relied upon the non-discrimination protections of the 2016 Grants Rule in its work to prevent discriminatory state legislation that affirmatively permits child welfare agencies to discriminate. As part of that work,

Family Equality was able to explain to state policymakers that HHS preempted any such license-to-discriminate laws for recipients of federal funds.

12.     True Colors United is a nonprofit, nonpartisan organization that is headquartered at 311 West 43rd Street, New York, NY 10036. Founded in 2008, True Colors United is an advocacy and direct services organization. Its mission is to implement innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people. Recognizing that LGBTQ youth are 120 percent more likely to experience homelessness than their non-LGBTQ peers, True Colors United furthers its mission by working to end youth homelessness and to ensure that homelessness services, many of which are funded through HHS grant programs, are safe for LGBTQ youth.

13.     In its daily operations, True Colors United accomplishes these objectives through several activities. First, True Colors United offers free training, education, and technical assistance programs to homelessness service providers in order to ensure that LGBTQ youth experiencing homelessness have access to safe and supportive services, and to increase the likelihood that youth homelessness is rare and brief. Second, True Colors United works at the federal, state, and local levels to promote funding, policies, systems, and protections that meet the needs of LGBTQ youth experiencing homelessness, including protections from discrimination, as well as affirmation and support related to all aspects of these youths' identities, including sexual orientation, gender identity, and gender expression. Third, True Colors United provides LGBTQ youth experiencing homelessness with leadership development opportunities that elevate their voices so they can play an active role in creating solutions to homelessness and other related problems.

14.     Prior to the Notice of Nonenforcement, True Colors United had relied on HHS's

non-discrimination requirements in educating and training recipients of HHS's Runaway and

Homeless Youth grant awards about the importance of providing services that are safe for

LGBTQ youth. As described in more detail below, True Colors United has regularly relied on

these requirements in its education and trainings for service providers. For example, True Colors

United has educated service providers on the federal non-discrimination protections when

presenting at conferences, such as True Colors United's annual Impact Summit. These

presentations informed providers of their legal obligations under the federal regulations and

helped the audience, including HHS grantees, to understand how the protections operate in

practice, using hypotheticals and interactive question-and-answer sessions.

15.     Plaintiff SAGE is a nonprofit, nonpartisan organization that is headquartered at

305 Seventh Avenue, New York, NY 10001. Founded in 1978, SAGE is a national advocacy and

services organization whose mission is to allow LGBTQ older people to age with respect and

dignity.

16.     SAGE accomplishes this mission through a variety of actions. First, SAGE runs

the National Resource Center on LGBT Aging, a technical assistance resource center aimed at

improving the quality of services and supports offered to LGBTQ older people, which was

established in 2010 through a grant from HHS under the Older Americans Act. The National

Resource Center provides resources, training, and technical assistance to a federal network of

elder service providers—including those who receive HHS funding—on issues such as LGBTQ

inclusion, LGBTQ cultural competency, and elder abuse and neglect. Second, SAGE provides

training to long-term care providers and senior housing providers in how to work effectively,

respectfully, and in a non-discriminatory manner with LGBTQ older people. Third, SAGE

provides direct services to LGBTQ older people in New York City through its "SAGE Centers," where LGBTQ older people may obtain meals, access social and cultural programming, and gain assistance with obtaining a variety of aging services (*e.g.*, health, financial, and social services; short-term counseling and support groups; care management; financial aid; and benefits and entitlements assistance). Similarly, SAGE coordinates a network of affiliates that provide various services nationwide, ranging from the organization of social gatherings to the provision of congregate meals (*i.e.*, meals served at group sites such as senior centers). Fourth, SAGE has established a housing initiative under which it has partnered with other organizations to support the construction of LGBTQ-friendly elder housing across the country and to build the first LGBTQ-friendly elder housing in New York. Fifth, SAGE works at the federal- and state-levels to ensure that policies, systems, and protections are in place to meet the needs of LGBTQ older people.

17.     Prior to the Notice of Nonenforcement, SAGE had relied on HHS's non-discrimination requirements to help ensure that service providers who receive funds under the Older Americans Act do not discriminate against LGBTQ older people. Recipients of those grant programs provide services designed to ensure that older people can age with dignity in their own homes. Such services include meal delivery services, chores assistance, and financial assistance. When HHS's non-discrimination protections were in place, SAGE relied on those protections to ensure that age-in-place services were safe for LGBTQ older people. This allowed SAGE to focus its policy efforts on securing affirmative protections for LGBTQ older people in other contexts, such as long-term care facilities.

18.     Defendant Alex Azar is sued in his official capacity as the U.S. Secretary of Health and Human Services. His official address is 200 Independence Avenue, S.W., Washington, D.C. 20201.

19.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency headquartered in Washington, D.C., at 200 Independence Avenue, S.W., Washington, D.C. 20201. HHS is an "agency" within the meaning of the APA. 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law.

21.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e).

22.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## LEGAL BACKGROUND

### A.  The Administrative Procedure Act

23.     The APA allows a person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action" to seek judicial review of that action. 5 U.S.C. § 702. Under the APA, a reviewing court may "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), and "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," *id.* § 706(2)(A).

24.     Under the APA, an agency is required to provide the public with notice of a proposed rule, 5 U.S.C. § 553(b), and give "interested persons an opportunity to participate in the

rule making through submission of written data, views, or arguments." *Id.* § 553(c). This requirement applies whenever an agency promulgates a substantive rule, which is an agency action with a present binding effect. Agencies may not evade this requirement by mischaracterizing a rule as a statement of policy. Although the APA exempts grants from notice and comment requirements generally, HHS has agreed to abide by these requirements in its actions related to grants. *See* Public Participation in Rule Making, 36 Fed. Reg. 2532-01 (Feb. 5, 1971).

25.     While individual enforcement decisions are presumptively unreviewable under the APA, *Heckler v. Chaney,* 470 U.S. 821, 832 (1985), general statements of enforcement policy are reviewable agency action in certain circumstances, such as when they are based on legal reasoning, *Crowley Caribbean Transport, Inc. v. Pena*, 37 F.3d 671, 677 (D.C. Cir. 1994); *cf. Batalla Vidal v. Duke*, 295 F.Supp.3d 127, 150 (E.D.N.Y. 2017).

26.     On review, an agency's action must be upheld, if at all, on the basis articulated by the agency itself. When an agency's stated rationale rests on a determination of law, the action may not stand if the agency has misconceived the law—even if the action might have been justified on some other ground.

27.     The APA also requires an agency to provide a reasoned explanation for its action, including a rational connection between the facts found and the choices made. An agency action shall be set aside as arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

**B.  The Regulatory Flexibility Act**

28.     The RFA generally requires agencies to complete an analysis—referred to as a regulatory flexibility analysis—of the potential effects a proposed rule may have on small business entities and to consider alternatives that would minimize the economic impacts of the rule on such entities. 5 U.S.C. §§ 603, 604. Congress found that regulations designed for large scale entities can place "disproportionate burden[s] … upon small businesses" and "create entry barriers" when applied uniformly to small businesses. Regulatory Flexibility Act, Pub. L. No. 96-354, § 2, 94 Stat. 1164 (1980). By requiring agencies to undertake the regulatory flexibility analysis, the RFA ensures that agencies consider the size and nature of the businesses that would be regulated when proposing regulation. *See id.*

29.     However, the RFA also recognizes that not all regulations will substantially impact small entities. In those instances, preparing a full regulatory flexibility analysis would be inefficient. Accordingly, the RFA provides that agencies may forgo the regulatory flexibility analysis if the head of the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities. 5 U.S.C. § 605(b). If it makes such a determination, the agency "shall publish [the] certification in the Federal Register, at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a succinct statement explaining the reasons for such certification." *Id.*

30.     An agency need not follow a set format or include specific words to satisfy the certification requirements. The D.C. Circuit has upheld a certification, for example, that lacked the word "certify" and relied on analysis that appeared throughout the rule's preamble. *Council for Urological Interests v. Burwell,* 790 F.3d 212, 226-27 (D.C. Cir. 2015).

31.     Similarly, where a rule maintains the status quo or does not impose additional burdens beyond pre-existing regulations, an agency may satisfy the requirement for a statement of factual basis by explaining succinctly that the rule will not impose additional burdens. *See Associated Builders & Contractors, Inc. v. Herman*, 976 F. Supp. 1, 15-16 (D.D.C. 1997).

## FACTUAL ALLEGATIONS

### A.  HHS Adopted the Uniform Administrative Requirements Pursuant to a Government-Wide Grantmaking Reform Effort.

32.     HHS adopted its grantmaking regulations as part of a government-wide effort to reform and standardize the federal grantmaking process. The goal of that reform was for federal agencies such as HHS to incorporate the Office of Management and Budget's ("OMB") Uniform Administrative Requirements ("UAR") into their respective regulations. Federal Awarding Agency Regulatory Implementation of OMB's Uniform Administrative Requirements, 79 Fed. Reg. 75871 (Dec. 19, 2014).

33.     The UAR standardized federal grantmaking regulations to ensure that federal grant programs are run more efficiently and effectively. 79 Fed. Reg at 75873. HHS adopted the UAR in 2014 with certain amendments intended to accommodate pre-existing agency-specific guidance. *See id.* at 75873, 75875.

### B.  The 2016 Grants Rule Clarified the Scope of HHS Anti-Discrimination Policies.

34.     On July 13, 2016, HHS proposed a rule that would modify HHS's adoption of the UAR, 45 C.F.R. Part 75, to reflect existing law and HHS policy that had not previously been codified in regulation. Health and Human Services Grants Regulation, 81 Fed. Reg. 45270-01 (July 13, 2016) ("2016 Proposed Rule"). Among other things, the agency proposed to clarify certain aspects of its grants regulations, to implement two Supreme Court decisions barring

discrimination against same-sex couples, and to "codif[y] long-standing [HHS] policies." 81 Fed.
Reg. at 45271, 45272.

35.     First, the 2016 Proposed Rule would "codif[y] a prohibition in the provision of
services of discrimination on the basis of age, disability, sex, race, color, national origin,
religion, sexual orientation, or gender identity." *Id.* at 45271. The agency explained that this non-
discrimination policy had already been adopted for all HHS service contracts under which
services for HHS programs are delivered directly to the public. By codifying the same policy in
the grants regulations, HHS "ma[de] . . . explicit" "that this same provision applies equally to
grants." *Id.*

36.     Second, HHS proposed to "codif[y] its implementation of the decisions in *U.S. v.
Windsor*, [570 U.S. 744] (2013), . . . and *Obergefell v. Hodges*, [135 S. Ct. 2584] (2015)" to
ensure that same-sex spouses are treated the same as different-sex spouses when determining
beneficiary eligibility or participating in grant-related activities. *Id.* HHS characterized both
changes as "non-controversial" because they were "proposed for consistency with law and
current HHS policy," but "nonetheless request[ed] public comment." *Id.*

37.     Recognizing the requirement to provide a final regulatory flexibility analysis or a
certification as to no significant economic impact on a substantial number of small entities, HHS
also addressed the RFA in the Proposed Rule. 81 Fed. Reg. at 45272. The agency concluded that:
"[t]his NPRM aligns 45 CFR part 75 with various regulatory and statutory provisions,
implements Supreme Court decisions, and codifies long-standing policies thus clarifying and
enhancing [HHS's implementing UAR regulations].. . . The proposed additions provide
enhanced direction for the public and will not have a significant economic impact beyond HHS's

current regulations." *Id.* HHS received no comments to the contrary or that otherwise raised any

concern about the impact of the proposed rule on small entities.

38.     In response to the non-discrimination provisions, HHS received "twelve

comments . . . , all of which were strongly supportive of the codification of the nondiscrimination

provisions in HHS awards." 81 Fed. Reg. 89393.

39.     HHS issued the final rule on December 12, 2016, adopting the same non-

discrimination requirements as in the proposed rule. *Id.*

40.     Accordingly, 45 C.F.R. § 75.300 now includes the following subsections:

(c) It is a public policy requirement of HHS that no person otherwise eligible will be
excluded from participation in, denied the benefits of, or subjected to discrimination in
the administration of HHS programs and services based on non-merit factors such as age,
disability, sex, race, color, national origin, religion, gender identity, or sexual orientation.
Recipients must comply with this public policy requirement in the administration of
programs supported by HHS awards.

(d) In accordance with the Supreme Court decisions in *United States v. Windsor* and in
*Obergefell v. Hodges*, all recipients must treat as valid the marriages of same-sex couples.
This does not apply to registered domestic partnerships, civil unions or similar formal
relationships recognized under state law as something other than a marriage.

45 C.F.R. § 75.300.

41.     Consistent with the absence of any comments to the contrary, HHS certified that,

for purposes of the RFA, the rule would not have a significant economic impact on a substantial

number of small entities. 81 Fed. Reg. at 89394. Repeating its conclusion from the proposed rule,

the Agency explained that the "final rule aligns 45 CFR part 75 with various regulatory and

statutory provisions, implements Supreme Court decisions, and codifies long-standing policies

thus clarifying and enhancing [HHS's implementing UAR regulations]." *Id.* In light of these

facts, and because the "additions provide enhanced direction for the public," the agency

concluded that the rule would "not have a significant economic impact beyond HHS's current regulations." *Id.*

42.     The effect of the 2016 Grants Rule was to make HHS's non-discrimination requirements clear and universal across its many grant programs and to clarify for grant recipients their obligations pursuant to the Supreme Court's decisions in *Windsor* and *Obergefell*. Previously, HHS's grant programs were subject to a patchwork of statutory and regulatory non-discrimination requirements which provided protections as to various, but not necessarily all, of the non-merit factors protected by the 2016 Grants Rule (*i.e.,* age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation).

43.     In addition to child welfare programs and services for youth experiencing homelessness and older people, the 2016 Grants Rule affected a wide range of other grant programs. Those programs include, but are not limited to major health initiatives (such as grants for HIV/AIDS prevention and support programs), early childhood programs (such as Head Start), nutrition assistance programs (such as Meals on Wheels), domestic violence prevention and response programs, and efforts to combat human trafficking.[1]

**C.  HHS Has Gutted the 2016 Grants Rule.**

44.     In conflict with HHS's established rules and policy, Defendants have engaged in systematic efforts to undermine the civil rights of, and non-discrimination protections for, LGBTQ people in the United States. HHS's decision to walk away entirely from enforcing the still-valid 2016 Grants Rule is a glaring example.

---

[1] *See* 45 C.F.R. § 75.101 (identifying scope of grant programs governed by the UAR).

45.     On November 1, 2019, HHS announced a pair of agency actions that limit the non-discrimination protections it will enforce.[2]

46.     First, Defendants announced a Notice of Proposed Rulemaking that will, if finalized, permanently weaken the non-discrimination provisions found at 45 C.F.R. § 75.300. Specifically, the proposed rule would require grantees to comply only with statutory discrimination protections. *See* Office of the Assistant Secretary for Financial Resources; Health and Human Services Grants Regulation, 84 Fed. Reg. 63831, 63832 (Nov. 19, 2019) ("2019 Proposed Rule") (proposing to amend 45 C.F.R. § 75.300(c) to prohibit discrimination "to the extent doing so is prohibited by federal statute"). In a corresponding press release, HHS claimed that the proposed rule would "better align its grant regulations with federal statutes," which Defendants assert "require that the federal government not infringe on religious freedom in its operation of HHS grant programs and address the impact of regulatory actions on small entities."[3]

47.     Simultaneously, Defendants issued a Notice of Nonenforcement informing the public that HHS would no longer enforce any of the still-valid grants provisions at issue in the 2016 Grants Rule—including the non-discrimination provisions—pending the agency's decision on the proposed rulemaking. Notice of Nonenforcement, 84 Fed. Reg. at 63809.

48.     To support the effective elimination of the 2016 Grants Rule by the Notice of Nonenforcement, HHS proffers a single rationale—namely, that the 2016 Grants Rule raised "significant concerns about compliance with the Regulatory Flexibility Act." *Id.* at 63809. The

---

[2] *See* Press Release, HHS, HHS Issues Proposed Rule to Align Grants Regulation with New Legislation, Nondiscrimination Laws, and Supreme Court Decisions (Nov. 1, 2019), https://www.hhs.gov/about/news/2019/11/01/hhs-issues-proposed-rule-to-align-grants-regulation.html.
[3] HHS Press Release.

Notice asserted that the 2016 Grants Rule may have violated the RFA because it "neither performed the RFA analysis described in 5 U.S.C. 602–604, nor expressly certified that the rules 'will not . . . have a significant economic impact on a substantial number of small entities' and provided a statement with the factual basis for such certification as provided for by section 605(b)." *Id.* at 63809.

49.     The Notice of Nonenforcement did not provide any meaningful analysis regarding the potential impact of the non-discrimination provisions specifically on small entities. Nor does the Notice provide any empirical analysis, or even a single example, of the impact of the Rule on small entities during the nearly three years during which it was operative.

50.     Nevertheless, the Notice determined that the provisions promulgated in the 2016 Grants Rule will not be enforced "with respect to *any* grantees until the rules have been properly re-promulgated[.]" *Id.* at 63811 (emphasis added). The Notice asserted that "[a]pplying these rules differently to agency grantees depending on size would be unfair, create increased compliance costs for all entities as they seek to determine whether they are or are not still subject to the rules, and impose additional administrative burdens on the Department disproportionate to the benefit of enforcement." *Id.*

51.     The Notice does not discuss the costs and benefits of the decision to suspend enforcement of the Rule on such a blanket basis, such as whether continuing to enforce the Rule in whole or in part would be in the interests of the beneficiaries of and participants in its programs (or the public interest in general). The Notice is devoid of any discussion regarding the harms that may result from its appearing to give grantees a license to discriminate, or regarding the potential violation of the constitutional rights of LGBTQ people, such as those the Supreme Court recognized in *Obergefell* and *Windsor*. Nor does the Notice discuss the possibility of

continuing to enforce the Rule while engaging in a new RFA analysis. The Notice also does not provide any basis for its assertions that suspending enforcement of the Rule only as to small entities would create increased compliance costs for those entities and additional administrative burdens on the Department.

**D. The Notice of Non-Enforcement Violates the APA.**

52.     The Notice of Nonenforcement is a reviewable agency action under the APA, notwithstanding Defendants' characterization of the action as an enforcement decision. The Notice established a categorical policy of nonenforcement that is grounded solely in a legal determination.

53.     The Notice of Nonenforcement is a substantive rule with a present binding effect on the agency and grant recipients. The Notice provides in no uncertain terms that the 2016 Grants Rule will not be enforced "with respect to any grantees[.]" *Id.* at 63811. This affirmatively and categorically circumscribes HHS's authority to enforce the anti-discrimination provisions of that Rule and, as a result, alters the legal obligations HHS will enforce against grant recipients. At a more fundamental and alarming level, the Notice sends a clear message to children, individuals, and families that HHS is prioritizing unquantified, unidentified harms to some grant recipients over their wellbeing.

54.     The Notice of Nonenforcement is procedurally invalid because it was promulgated without notice and the opportunity for public comment.

55.     The Notice of Nonenforcement is arbitrary and capricious, an abuse of discretion, and otherwise not in accordance with law in numerous ways, including:

56.     Defendants' sole stated rationale for the action is legally incorrect. Contrary to the Notice of Nonenforcement's conclusions, HHS promulgated the 2016 Grants Rule in accordance

with the RFA. Consistent with that statute, it certified that the Rule would not have a significant economic impact on small entities. 81 Fed. Reg. at 89394. Further, the notice promulgating the 2016 Grants Rule explained that the rule would not have a significant economic impact beyond the effects of the agency's current regulations because it merely aligned 45 CFR Part 75 with existing law, implemented Supreme Court decisions, and codified long-standing policies. *Id.*

57.     Further, even if the Rule's RFA analysis was flawed, the decision not to enforce the Rule at all is arbitrary and capricious. Defendants failed to provide a reasoned explanation for this decision or to consider important aspects of the problem. Instead, Defendants concluded without any meaningful analysis or support that HHS would abandon enforcement as to *all* grantees because to do otherwise would impose "administrative burdens . . . disproportionate to the benefit of enforcement." 84 Fed. Reg. at 63811. Defendants' reliance on this cost-benefit conclusion is fundamentally flawed as Defendants fail to name or even identify the nature of the benefits they are taking away or the costs that they are supposedly avoiding. *Id.* This omission is striking because, as shown further below, the anti-discrimination provisions that Defendants abandon provide protections for millions of people served by HHS-funded grant programs, including by clarifying the constitutional rights afforded to LGBTQ people, including those recognized by the Supreme Court in *Obergefell* and *Windsor*. HHS's Notice provides no explanation for its decision to step away from ensuring that these rights are protected. Nor does it acknowledge that a policy of blanket non-enforcement will directly harm many of those people that the 2016 Grants Rule intended to protect. And HHS's move flies in the face of years of its

own studies,[4] bulletins,[5] trainings,[6] information memoranda,[7] and policies or practices that have rightly emphasized how harmful discrimination is to wellbeing and, conversely, how important non-discrimination protections are to ensure all people receive maximum benefit from services and programs.

58.     Nor did the agency meaningfully consider other approaches contemplated by the RFA. For example, HHS could have continued to enforce the Rule while revisiting the RFA analysis, an option that the RFA itself specifically provides for non-compliant rules subject to judicial review. 5 U.S.C. § 611(a)(4)(A). Indeed, the statute indicates that such an option is appropriate when "continued enforcement of the rule is in the public interest." *Cf. id*. § 611(a)(4)(B). Or HHS could have determined to suspend enforcement only against small entities. *Id.* Yet HHS's explanation omitted any discussion of the "benefit of enforcement" as to some or all entities. 84 Fed. Reg. at 63811.

---

[4] *See, e.g.*, HHS, Advancing LGBT Health & Well-Being: 2016 Report of the HHS LGBT Policy Coordinating Committee (2016), https://www.hhs.gov/sites/default/files/2016-report-with-cover.pdf; HHS, OPRE Report #2014-79, Human Services for Low-Income and At-Risk LGBT Populations: An Assessment of the Knowledge Base and Research Needs (2014), https://www.acf.hhs.gov/sites/default/files/opre/lgbt_hsneeds_assessment_reportfinal1_12_15.pdf.

[5] *See, e.g.,* HHS, *The Brooklyn Hospital Center Implements Non-Discriminatory Practices to Ensure Equal Care for Transgender Patients* (July 14, 2015), https://www.hhs.gov/sites/default/files/ocr/civilrights/activities/agreements/TBHC/statement.pdf.

[6] *See, e.g.,* Sylvia Bereknyei et al., Stopping Discrimination before it Starts: the Impact of Civil Rights Laws on Health Care Disparities, MedEd PORTAL (2009), https://doi.org/10.15766/mep_2374-8265.7740 (a joint project between HHS's Office for Civil Rights, Office of the General Counsel, and Stanford University School of Medicine).

[7] *See, e.g.,* Letter from HHS Office for Civil Rights Administration for Children and Families and U.S. Dep't of Justice Civil Rights Division Federal Coordination and Compliance Section, https://www.hhs.gov/sites/default/files/title-vi-child-welfare-guidance-10-19-16.pdf (addressing implementation of Title VI of Civil Rights Act in child welfare system).

E.  **The Notice of Nonenforcement Invites Discrimination Against Already Vulnerable LGBTQ Youth in Foster Care and Experiencing Homelessness.**

59.     LGBTQ youth are overrepresented in both the foster care setting and among youth experiencing homelessness. In foster care, for example, LGTBQ youth represent 30.4 percent of the population, even though they comprise only 11.2 percent of youth overall.[8] Similarly, LGBTQ youth are 120 percent more likely to experience homelessness than their non-LGBTQ peers and comprise 40 percent of all youth experiencing homelessness.[9]

60.     One 2019 study by researchers at the University of Texas at Austin explained that LGBTQ youth are overrepresented in both settings due to a pattern of discrimination. When LGBTQ youth disclose their sexual orientation or gender identity to family members, they can face verbal and physical harassment, which in turn can result in their entry into the child welfare and foster systems, or in homelessness.[10] This pattern of discrimination continues in the child welfare and foster systems, where "LGBTQ youth are more likely to experience victimization and abuse by social work professionals, foster parents, and peers," which result in "poorer functional outcomes," including youth running away from the foster system.[11]

61.     These problems are compounded when foster care and adoption agencies refuse to place children in the homes of LGBTQ prospective parents and guardians. Such discrimination harms LGBTQ youth in two ways. First, it signals to LGBTQ youth that families with LGBTQ parents are less deserving of dignity and equal protection under the law. Second, by excluding

[8] Laura Baams et al., *LGBTQ Youth in Unstable Housing and Foster Care*, 143 Pediatrics 3 (2019), https://pediatrics.aappublications.org/content/pediatrics/143/3/e20174211.full.pdf.
[9] Michael Santos and Justin T. Rush, True Colors United and the National Law Center on Homelessness & Poverty, State Index on Youth Homelessness 13, 19 (2018), *available at* https://drive.google.com/file/d/14hCgF6gwxF7At2kanWLulciE1NPN-Z5C/view.
[10] *LGBTQ Youth in Unstable Housing and Foster Care* at 2.
[11] *Id.*

LGBTQ adults from eligibility, the total pool of potential homes, and particularly LGBTQ-affirming homes, for kids who desperately need those homes, is diminished.

62.     Such harms contribute to "an overlapping issue: homelessness,"[12] where LGBTQ youth continue to encounter discrimination and other barriers to "care and support from programs that are not designed to serve them."[13] These realities "stymie[] their ability to exit homelessness."[14]

63.     The anti-discrimination provisions in the 2016 Grants Rule provided clear and uniform protections for LGBTQ youth and families receiving HHS-funded services, as well for the millions of people who receive services across all HHS grant programs. By abandoning these protections, the Trump Administration affirmatively invites discrimination, especially on the basis of sexual orientation and gender identity.

64.     In the child welfare and foster systems, HHS grant recipients include child welfare agencies that receive grant money under the Social Security Act Title IV-E program. Those grants are intended to support those agencies' work in providing foster care, adoption assistance, and kinship guardian assistance. LGBTQ youth have historically suffered from various forms of discrimination at the hands of many child welfare agencies, including conversion therapy, verbal and physical abuse, a refusal to place LGBTQ youth with LGBTQ parents, and other forms of discrimination. These kinds of harms are exactly what HHS's non-discrimination protections were designed to prevent. By issuing the Notice of Nonenforcement, HHS has explicitly invited child welfare agencies that receive HHS grant funding to continue to discriminate in these ways.

---

[12] *Id.*
[13] State Index on Youth Homelessness at 13.
[14] *Id.*

65.     The Notice of Nonenforcement also increases the likelihood of discrimination by recipients of grant money under the Runaway and Homeless Youth Street Outreach, Basic Center, and Transitional Living programs. Under those programs, grant recipients provide youth experiencing homelessness with emergency shelter, crisis intervention, food, clothing, and medical care, as well as longer-term interventions to support them in achieving better outcomes in employment, housing, health, and education. But many of those providers have also historically been known to discriminate against LGBTQ youth. For example, some providers impose discriminatory conditions on their services, forcing LGBTQ youth to choose between forgoing services altogether or accepting housing arrangements, clothing, and other services that deny their sexual orientation or gender identity.[15] Providers also subject LGBTQ youth to messages condemning their sexual orientation or gender identity, including dangerous and harmful conversion therapy practices that attempt to change their identity. HHS's Notice of Nonenforcement invites homelessness service providers to engage in such discrimination.

66.     That invitation is especially harmful because it compounds the agency's decisions to abandon other efforts to prevent discrimination against LGBTQ youth in the Runaway and Homeless Youth grant programs. While those programs include their own regulatory non-discrimination protections for sexual orientation and gender identity, HHS has abandoned efforts to ensure that Runaway and Homeless Youth grantees understand and comply with the program-specific non-discrimination requirements.

---

[15] Caitlin Rooney et al., Center for American Progress, Discrimination Against Transgender Women Seeking Access to Homeless Shelters (2016), https://www.americanprogress.org/issues/lgbtq-rights/reports/2016/01/07/128323/discrimination-against-transgender-women-seeking-access-to-homeless-shelters/.

67.     Promulgated in 2016, the Runaway and Homeless Youth non-discrimination

provisions require grantees to provide services that are "language appropriate, gender appropriate

. . . , and culturally sensitive and respectful of the complex social identities of youth[.]" 45

C.F.R. § 1351.22(a). These provisions further state that "[n]o runaway youth or homeless youth

shall . . . be excluded from participation in, be denied the benefits of, or be subject to

discrimination under, any program or activity funded in whole or in part under the Runaway and

Homeless Youth Act" on the basis of "race, ethnicity, nationality, age, religion/spirituality,

gender identity/expression, sexual orientation, socioeconomic status, physical or cognitive

ability, language, beliefs, values, behavior patterns, or customs." *Id.*

68.     Recognizing that service providers need education and support to bring their

services into alignment with all grant program requirements, HHS's Runaway and Homeless

Youth regulations require grantees to "participate in technical assistance, monitoring, and short

term training as a condition of funding, as determined necessary by HHS, in such areas as . . .

[LGBTQ] and intersex youth[.]" *Id.* § 1351.23(a).

69.     Consistent with its regulations, HHS has previously required grantees to

participate in LGBTQ training and to certify that their programs are non-discriminatory and take

LGBTQ needs into account.[16] Further, the agency ensured that LGBTQ youth training was

available through the Runaway and Homeless Youth Technical Assistance and Training Center

---

[16] *See, e.g.*, Administration on Children, Youth, and Families, 2014 Basic Center Program
Funding Opportunity Announcement 5, 20, 56 (May 12, 2014),
https://ami.grantsolutions.gov/files/HHS-2014-ACF-ACYF-CY-0792_0.pdf; Administration on
Children, Youth, and Families, 2016 Street Outreach Program Funding Opportunity
Announcement 6, 7, 22, 59 (July 5, 2016), https://ami.grantsolutions.gov/files/HHS-2016-ACF-
ACYF-YO-1124_0.pdf.

("RHYTTAC"), which is operated by a private contractor, but funded and overseen by HHS.[17]
On information and belief, RHYTTAC has provided non-discrimination and other LGBTQ
trainings at its annual conference since as early as 2012. These trainings have typically been
provided by organizations like True Colors United, who submit applications to present at the
conference.

70.     However, HHS has abandoned these efforts to ensure that grant recipients
understand and comply with the LGBTQ non-discrimination requirements for the Runaway and
Homeless Youth grant programs. Since 2017, funding opportunity announcements for Runaway
and Homeless Youth grants no longer require grant applicants to participate in LGBTQ training
or to certify that their programs do not discriminate against LGBTQ youth.[18] Likewise, HHS
provided no LGBTQ youth training at the 2019 annual RHYTTAC conference despite the fact
that organizations such as True Colors United submitted applications to present such training.
True Colors United's application was denied without explanation.

71.     By ceasing its LGBTQ technical assistance and training and by no longer
including LGBTQ non-discrimination requirements in its Runaway and Homeless Youth funding
opportunity announcements, HHS has effectively forsaken the LGBTQ non-discrimination
protections and the proactive development and distribution through training of affirming
practices specific to those grant programs.

---

[17] *Homepage,* Family & Youth Services Bureau, Runaway and Homeless Youth Training and
Technical Assistance Center, https://www.rhyttac.net/.
[18] *See, e.g.*, Administration on Children, Youth, and Families, 2017 Street Outreach Program
Funding Opportunity Announcement (July 11, 2017), https://ami.grantsolutions.gov/files/HHS-
2017-ACF-ACYF-YO-1241_0.pdf; Administration on Children, Youth, and Families, 2019
Street Outreach Program Funding Opportunity Announcement (July 1, 2019),
https://ami.grantsolutions.gov/files/HHS-2019-ACF-ACYF-YO-1554_0.pdf.

72.     Against this background, the agency's decision to abandon the non-discrimination protections in the 2016 Grants Rule leaves LGBTQ youths experiencing homelessness without effective federal statutory or regulatory protection from discrimination. HHS's failure even to acknowledge the conflict between the RHY Rule and its work to support LGBTQ youth is yet another example of its failure to conduct a rational analysis and its taking action contrary to its own findings and technical assistance.

### F.  The Notice of Nonenforcement Invites Discrimination Against LGBTQ Older People.

73.     LGBTQ older people are highly vulnerable to the consequences of systemic discrimination. In order to age successfully, older people require competent healthcare, economic security, and strong family and social support.[19] But due to the cumulative effect of a lifetime of discrimination and stigma, LGBTQ older people face significant disparities in these areas when compared to their non-LGBTQ peers—disparities that profoundly impact their quality of life.[20] Many LGBTQ older people, for example, live with serious economic insecurity after experiencing a lifetime of housing and employment discrimination.[21] They are also often socially isolated and vulnerable, having relied largely on a smaller circle of chosen family and friends throughout their lives, as a result of family rejection and legalized discrimination.[22] And for most of their lives, LGBTQ older people have been unable to take advantage of the financial security

---

[19] SAGE and Movement Advancement Project, Understanding Issues Facing LGBT Older Adults6 (2017), https://www.sageusa.org/wp-content/uploads/2018/05/sageusa-understanding-issues-facing-lgbt-older-adults.pdf ("SAGE Report").
[20] *Id.*
[21] *Id.*
[22] *Id.*

and other protections afforded by marriage.[23] These vulnerabilities are compounded by the fact that LGBTQ older people continue to face discrimination as they age.[24]

74.    Against this background, LGBTQ older people are particularly likely to rely on the support and social services provided by non-profits and government-funded programs. Among other critical services, LGBTQ older people rely on programs that are funded by HHS under the Older Americans Act, which aims to enable older people to age with dignity and remain independent as long as possible. To that end, HHS administers programs that provide a wide range of home and community-based services, such as home-delivered nutrition services (*i.e.*, Meals on Wheels), congregate nutrition services (*i.e.*, meals served at group sites such as senior centers), in-home chore assistance services, transportation services, legal services, and elder abuse prevention services.[25]

75.    HHS's Notice of Nonenforcement jeopardizes these already-vulnerable LGBTQ older people by abandoning the only codified non-discrimination protections available to most of them in this context. Unlike other grant programs, the Older Americans Act does not include explicit non-discrimination provisions, and most states lack explicit non-discrimination protections for the type of home and community-based services provided under the Act. Further, by grounding its Notice of Nonenforcement in a claimed need to advance religious liberty, HHS

---

[23] *Id.*
[24] *Id.* at 7, 17 (discussing discrimination faced by LGBTQ older people in housing, health care, and long-term care facilities).
[25] Congressional Research Service, R43414, Older Americans Act: Overview and Funding 1, 5 (2018), https://crsreports.congress.gov/product/pdf/R/R43414.

has explicitly invited providers of these services, many of whom are faith-based organizations,[26] to discriminate against LGBTQ older people.

### G. Injuries to Plaintiffs.

76.    The Notice of Nonenforcement directly harms Plaintiffs.

   a.   <u>Family Equality</u>

77.    The Notice conflicts with, impairs, and frustrates Family Equality's mission and activities by impeding its ability to ensure that foster care and adoption services are safe for LGBTQ youth and non-discriminatory for LGBTQ potential parents and guardians.

78.    First, the Notice introduces substantial confusion regarding the legal obligations of grant recipients and the right of the populations they serve to be free from discrimination. Under the 2016 Grants Rule, all HHS grant recipients were subject to the same anti-discrimination prohibitions, which protected against discrimination on the basis of age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity. In the absence of those anti-discrimination provisions, grant recipients are subject to a patchwork of federal and state statutory and regulatory protections, which vary from program to program, and from state to state.

79.    Family Equality has responded to the confusion the Notice has caused by conducting a widespread and comprehensive education and outreach campaign to ensure that LGBTQ youths and families understand the full impact of HHS's nonenforcement action and that child welfare agencies receiving HHS grant funds understand their existing obligations not to discriminate against LGBTQ youth. Specifically, Family Equality has already spent

---

[26] *See* National Association of Area Agencies on Aging, Local Leaders in Aging and Community Living 11 (2017), https://www.n4a.org/Files/LocalLeadersAAA2017.pdf (noting that 66 percent of Area Agencies on Aging are faith-based organizations).

approximately 40 hours of staff time assessing the legal effect of the Notice of Nonenforcement, working with other organizations to identify and understand the anti-discrimination protections left in place for HHS's many grant programs. Family Equality has also spent at least 15 hours analyzing the Notice of Nonenforcement's impacts on youths and families, such as the likelihood that increased discrimination will lead to fewer placements and kinship care opportunities, including by conducting research, reading journal articles, and speaking with experts at other organizations. Additionally, Family Equality has spent approximately 10 hours identifying and interviewing LGBTQ families that have experienced discrimination in the foster care system to better understand the impacts of HHS's action. Relying on this research and analysis, Family Equality has spent approximately 70 hours creating and disseminating educational materials, including: email action alerts sent to Family Equality's full network of constituents and partner organizations; online resources for child welfare advocates, LGBTQ parents, and faith-based organizations; and various forms of social media. Family Equality has also spent at least another 22 hours preparing for and conducting informal briefings via conference call for its partner organizations, and approximately 23 hours on media relations, including press releases, securing interviewees for stories, responding to media inquiries, and providing press interviews.

      80.    Collectively, Family Equality has diverted well over 170 hours of staff time responding to the Notice of Nonenforcement through its public outreach and education campaign, and it expects to continue to expend significant staff time on these efforts going forward. This diverts valuable staff time and resources away from Family Equality's state work and other projects on the federal level, including its work to promote the Every Child Deserves a Family Act—proposed legislation that would provide robust statutory protections for LGBTQ

families and youths in the child welfare and foster care systems—as well as its work on a variety of other policy issues important to its mission, such as paid leave, healthcare, and housing.

81.     Second, Family Equality previously relied upon the 2016 Grants Rule in its work to defeat proposed legislation in states throughout the country, such as license-to-discriminate laws that affirmatively permit state-licensed child welfare agencies to refuse to provide services to and place children with LGBTQ people and same-sex couples if doing so conflicts with an agency's religious belief. As part of that work, Family Equality works to educate state legislators and policymakers on the impacts such laws will have on LGBTQ families and youth. When the 2016 Grants Rule was in place, Family Equality was able to explain to state policymakers that HHS preempted any such license to discriminate laws for recipients of federal funds. Without that tool, Family Equality's efforts to prevent discriminatory state legislation will be less effective.

   b. <u>True Colors United</u>

82.     The Notice conflicts with, impairs, and frustrates True Colors United's mission and activities by impeding its ability to ensure that homelessness services are safe for LGTBQ youth and more broadly, to end youth homelessness. Specifically, the Notice of Nonenforcement impairs True Colors United's ability to provide services related to youth experiencing homelessness in the following ways:

83.     First, True Colors United previously relied upon the 2016 Grants Rule to educate service providers on the importance of not discriminating against LGBTQ youth. For example, when conducting trainings at conferences, such as the Youth Impact Summit,[27] True Colors

---

[27] True Colors United similarly presented information on HHS's anti-discrimination protections at the 2017 RHYTTAC conference, the True Colors United 2019 D.C. Summit, four state-wide

United presented information on the federal prohibitions against such discrimination, and engaged in interactive question-and-answer sessions to help providers understand what discrimination looks like in practice, as well as its negative impacts on LGBTQ youth. Without that tool, True Colors United's efforts to ensure that services are safe and supportive for LGBTQ youth will be less effective. For some providers that merely lack awareness around LGBTQ issues, the Notice of Nonenforcement signals that providers do not need to improve their services for LGBTQ youth. For other service providers, HHS's Notice of Nonenforcement serves as an explicit invitation to discriminate.

84.     In the absence of the 2016 Grants Rule's anti-discrimination protections, True Colors United will now have to obtain state-level protections to replace the defunct federal standards. As a direct response to the agency's actions, True Colors United has already begun these efforts in New Mexico and two other states, requiring its Public Policy and External Affairs Director to review those states' current regulations and programs, craft recommended policies, engage with the relevant state agencies, and travel to further meet with those agencies in person. To date, True Colors United has already spent approximately 135 hours of staff time on these three states, including holding 8 phone calls, taking 5 trips for in person meetings, and spending several hours in preparation for those meetings.

85.     Because only 12 percent of states have protections in place for LGBTQ youth experiencing homelessness, True Colors United expects to continue this work to improve protections in as many states as possible. For each state, this will require True Colors United to conduct research on the unique issues facing LGBTQ youth experiencing homelessness in that

---

conferences for Runaway and Homeless Youth providers, and the 2018 National Alliance to End Homelessness Conference.

state, craft state-specific recommendations, engage with state agencies and stakeholders, and—to the extent new protections are adopted by state regulations—participate in the regulatory process by submitting public comments on proposed rulemakings.

86.     Second, as discussed above, the Notice of Nonenforcement introduces substantial confusion regarding the legal obligations of grant recipients. In the absence of those anti-discrimination provisions, grant recipients are subject to a patchwork of federal and state statutory and regulatory protections, and a lack of guidance about the constitutional rights of program participants. This problem is compounded for youth homelessness service providers, which face additional confusion as a result of HHS's decision to abandon efforts to protect LGBTQ youth more broadly. While youth homelessness providers that receive HHS grants under the Runaway and Homeless Youth grant programs are technically subject to program-specific discrimination protections, the agency has ceased to provide LGBTQ technical assistance and training and no longer requires grant applicants to certify that their programs are non-discriminatory. These agency actions have strongly signaled that service providers need not concern themselves with understanding and preventing LGBTQ discrimination. That messaging is reinforced by the Notice of Nonenforcement and the concomitant 2019 Proposed Rule, which would require HHS grantees to comply only with statutory protections.

87.     This confusion has required True Colors United to conduct an education and outreach campaign to ensure that service providers receiving Runaway and Homeless Youth grant funds understand their existing obligations not to discriminate against LGBTQ youth. Specifically, True Colors United staff have already conducted informal briefings with several partner organizations to explain the impact of the agency's Notice of Nonenforcement and to emphasize that, despite the lack of any enforcement, service providers are still subject to the non-

discriminations provisions specific to the Runaway and Homeless Youth grant programs. These partner organizations include A Way Home America, an organization that works directly with local communities and service providers across the United States, and Funders Together to End Homelessness, a funding roundtable for organizations dedicated to ending homelessness. These partner organizations will, in turn, ensure that the information in True Colors United's briefings will be distributed to local communities and service providers to the extent possible. True Colors United has already spent approximately 10 hours of staff time on these briefings and expects to hold further briefings in the future.

88.    In order to combat the harm caused by HHS's actions with these responsive efforts, True Colors United has already expended valuable staff time and resources. As noted above, True Colors United's staff have already spent a total of approximately 145 hours on state-level work and its education and outreach campaign. Going forward, True Colors United expects to continue to divert a significant amount of its staff time and resources to both efforts. Indeed, the True Colors United Public Policy and External Affairs team will focus almost entirely on its new state-level work in 2020, which it estimates will take 65 percent of its staff time and over $65,000.

89.    These resources are being diverted from True Colors United's other work. Prior to the Notice of Nonenforcement, the Public Policy and External Affairs team had planned on a radically different "capacity-building" agenda, which would have included conducting regional summits to facilitate resource and information sharing between communities facing similar challenges and to empower and train local youth, providers, and advocates to organize their own grassroots campaigns, as well as a youth legislature project for transgender youth to receive hands-on training in state legislative advocacy. True Colors United's Public Policy team no

longer plans to pursue budgetary resources for those regional conferences because the team will

not have enough time to plan or facilitate them. As a result, the youth legislative project is likely

postponed until 2021. But for HHS's Notice of Nonenforcement, True Colors United would not

have had to divert resources away from that work.

      c.  <u>SAGE</u>

90.     Finally, the Notice also conflicts with, impairs, and frustrates SAGE's mission

and activities by impeding its ability to ensure that LGBTQ older people are able to age with

dignity.

91.     First, SAGE previously relied upon the 2016 Grants Rule to help ensure that

service providers did not discriminate against LGBTQ older people. By removing those

protections, HHS's Notice of Nonenforcement serves as a signal to service providers that they

may discriminate against LGBTQ older people with impunity. SAGE has already diverted, and

will continue to divert, resources to combat these harms. SAGE has begun working to obtain

state-level protections to fill the gap left by HHS's now-abandoned non-discrimination

protections. SAGE's policy team, communications team, and executive leadership have already

spent more than 20 hours designing a proposed new program to research and educate state

policymakers on the need for state-level protections that cover the types of home and

community-based services that are funded by HHS under the Older Americans Act (and,

accordingly, previously were subject to the 2016 Grants Rule). SAGE anticipates spending 50 to

100 hours of staff time and $50,000 to $100,000 on this program in 2020.

92.     Second, to combat the confusion caused by the Notice of Nonenforcement as

described above, SAGE has begun and will continue to conduct an education and outreach

campaign to ensure that aging advocacy organizations and LGBTQ older people understand the

full impact of the Notice, including its impact on the protections enjoyed by LGBTQ older

people. For example, SAGE's policy staff have already spent 10-15 hours researching, drafting,

and disseminating materials on the Notice of Nonenforcement to its partner organizations. Those

organizations, including members of the Leadership Council of Aging Organizations, have in

turn disseminated SAGE's materials to service providers and other stakeholders. Similarly,

SAGE has already spent 12 hours discussing the impacts of HHS's actions at various

conferences and roundtables, including the January 2020 Creating Change Conference, as well as

a monthly National LGBT Aging roundtable and monthly SAGE affiliate calls.

93.     Third, SAGE is also forced to respond to the Notice of Nonenforcement by

ensuring that service providers continue to understand the importance of making their services

inclusive and safe for LGBTQ older people. In the past, for example, SAGE has published

guidance on how aging services agencies can provide inclusive services for LGBT adults.[28]

Whereas the 2016 Grants Rule provided a new regulatory non-discrimination requirement

applicable to home and community-based service providers funded by the Older Americans Act,

the decision not to enforce it diminishes these providers' obligation to accommodate LGBTQ

older people's unique needs. SAGE will continue to expend staff time and effort educating

providers about these needs and encouraging them to continue to meet these needs despite the

rollback of HHS's non-discrimination protections. Collectively, these responsive efforts have

diverted valuable staff time and resources away from SAGE's other projects, including, for

---

[28] For example, through the National Resource Center on LGBT Aging SAGE published
Inclusive Services for LGBT Older Adults: A Practical Guide To Creating Welcoming Agencies
(2012), https://www.sageusa.org/wp-content/uploads/2018/05/sageusa-welcoming-agency-guide-
inclusive-services-for-lgbt-older-adults.pdf.

example, its work to secure state-level non-discrimination protections in other contexts, such as in long-term care facilities.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Agency Action Without Observance of Procedure Required by Law
### in Violation of 5 U.S.C. § 706(2)(D)

94.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

95.     HHS is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

96.     Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

97.     The Notice of Nonenforcement constitutes final agency action that is reviewable by this Court.

98.     The APA requires administrative agencies to follow notice-and-comment rulemaking procedures to promulgate substantive rules. *See* 5 U.S.C. § 553. The APA defines "rule" broadly to include:

> The whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages . . . .

5 U.S.C. § 551(4).

99.     HHS has bound itself to impose the notice and comment procedures required by the APA in its actions related to grants. 36 Fed. Reg. at 2532.

100.     The Notice of Nonenforcement constitutes a substantive rule subject to APA's notice-and-comment requirements because it affirmatively and categorically circumscribes HHS's authority to enforce requirements that HHS grant recipients not discriminate against program beneficiaries and participants based on a variety of non-merit factors, including sex, gender identity, sexual orientation, and religion.

101.     In issuing the Notice of Nonenforcement, Defendants impermissibly promulgated a new rule without undertaking notice-and-comment rulemaking.

102.     Plaintiffs were harmed and continue to be harmed by this unlawful act.

### SECOND CLAIM FOR RELIEF
### Agency Action That Is Grounded in a Mistake of Law
### in Violation of 5 U.S.C. § 706(2)(A)

103.     Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

104.     Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

105.     The Notice of Nonenforcement is arbitrary and capricious, an abuse of discretion, and not in accordance with law because Defendants grounded their action in a mistaken determination of law: that the 2016 Grants Rule did not comply with the Regulatory Flexibility Act.

106.     Plaintiffs were harmed and continue to be harmed by this unlawful act.

### THIRD CLAIM FOR RELIEF
### Agency Action That Is Arbitrary and Capricious,
### An Abuse of Discretion, or Otherwise Not in Accordance with Law
### in Violation of 5 U.S.C. § 706(2)(A)

107.    Plaintiffs repeat and incorporate by reference each of the foregoing allegations as if fully set forth herein.

108.    Under 5 U.S.C. § 706(2), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of statutory jurisdiction, authority, or limitations; or without observance of procedure required by law.

109.    The Notice of Nonenforcement is arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants failed to provide a reasoned explanation for their decision to cease enforcement with respect to all entities, failed to consider alternative remedies, failed to consider the costs and benefits of their decision, and failed to consider whether continued enforcement of the non-discrimination protections is in the public interest.

### **Prayer for Relief**

WHEREFORE, Plaintiffs pray that this Court:

1.    declare that Defendants' promulgation of the Notice of Nonenforcement violates the APA;

2.    set aside and vacate the Notice of Nonenforcement;

3.    enjoin Defendants from implementing the Notice of Nonenforcement;

4.    award Plaintiffs costs, attorneys' fees, and other disbursements for this action; and

5.    grant any other relief this Court deems appropriate.

DATED: March 19, 2020

Respectfully submitted,

*/s/ Jeffrey B. Dubner*

Kristen Miller (D.C. Bar No. 229627)*
Robin Thurston (D.C. Bar No. 1531399)*
Sean Lev (D.C. Bar No. 449936)*
Jeffrey B. Dubner (N.Y. Bar No. 4974341)
Democracy Forward Foundation
P.O. Box 34553
Washington, DC 20043
(202) 701-1782
kmiller@democracyforward.org*
rthurston@democracyforward.org*
slev@democracyforward.org*
jdubner@democracyforward.org

Puneet Cheema (CA Bar No. 268677)*
Lambda Legal Defense and Education Fund,
Inc.
1776 K Street N.W., 8th Floor
Washington, D.C. 20006
(202) 804-6245
pcheema@lambdalegal.org

Karen Loewy (N.Y. Bar No. 5145883)**
Lambda Legal Defense and Education Fund,
Inc.
120 Wall Street, 19th Floor
New York, NY 10005
(212) 809-8585
kloewy@lambdalegal.org

*Motions for admission *pro hac vice*
forthcoming.

** Petition for Admission pending.

*Counsel for Plaintiffs*