

June 25, 2020

**By ECF**
Honorable Mary Kay Vyskocil
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    *Family Equality, et al. v. Azar, et al.*, No. 20-cv-2403 (MKV)

Dear Judge Vyskocil,

    On June 22, 2020, Defendants (together, "HHS") requested a pre-motion conference on a motion to dismiss, or, in the alternative, for a stay of the litigation. I submit this response on behalf of the Plaintiffs.

    In this action, Plaintiffs challenge HHS's unlawful Notice of Nonenforcement ("Notice"), stating that it will no longer enforce 45 C.F.R. § 75.300, which prohibits HHS grant recipients from discriminating based on age, disability, sex, race, color, national origin, religion, sexual orientation, or gender identity. In its letter, HHS argues (1) that Plaintiffs failed to assert an injury-in-fact sufficient to confer standing and (2) that staying the litigation would not prejudice Plaintiffs and would avoid wasteful litigation. Both claims are incorrect.

    <u>Plaintiffs Have Sufficiently Alleged Injury-In-Fact</u>. An organization may sue "on its own behalf so long as it can independently satisfy the requirements of Article III standing[.]" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). "[O]nly a 'perceptible impairment' of an organization's activities is necessary for there to be an 'injury-in-fact.'" *Id* at 157. And "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing." *Centro de la Comunidad Hispana v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017).

    Here, Plaintiffs' alleged injuries easily clear this bar. The Notice impairs the activities of all three Plaintiffs, for example, by "introduc[ing] substantial confusion regarding the legal obligations of grant recipients and the right of the populations they serve to be free from discrimination." Compl. ¶ 78; *see* ¶¶ 86, 92, ECF No. 23. This impairs Plaintiffs' efforts to train grant recipients on their legal obligations, *id.* ¶¶ 13, 83, and to educate program participants on their rights, *id.* ¶ 10. To combat this confusion, Plaintiff Family Equality has already "diverted well over 170 hours of staff time" to an "education and outreach campaign to ensure that LGBTQ youths and families understand the full impact of HHS's nonenforcement action and that child welfare agencies receiving HHS grant funds understand their existing obligations not to discriminate[.]" *Id.* ¶ 79. Plaintiffs True Colors United ("True Colors") and SAGE have also expended valuable staff time on similar education and outreach campaigns. *Id.* ¶¶ 87, 92.

1

The Notice also impairs plaintiffs' activities in other ways. True Colors "previously relied" on the non-discrimination requirements codified at 45 C.F.R § 75.300 to "educate service providers on the importance of not discriminating against LGBTQ youth," including by presenting information on those requirements during trainings at numerous conferences. *Id.* ¶ 83. HHS's Notice of Nonenforcement renders those training activities "less effective" by removing that tool. *Id.* Likewise, the Notice impairs True Colors' and SAGE's efforts to ensure that services are safe for LGTBQ program participants by "serv[ing] as an explicit invitation to discriminate." *Id.* ¶ 83; *see* ¶ 91. To respond to the harms created in the absence of HHS's anti-discrimination protections, both True Colors and SAGE have already diverted, and will continue to divert, significant resources from their other activities. True Colors, for example, has already expended approximately "135 hours of staff time," to "obtain state-level protections to replace the defunct federal standards." *Id.* ¶¶ 84-85. Similarly, SAGE has expended 20 hours of staff time, and anticipates expending 50 to 100 more on a "new program to research and educate state policymakers on the need for state-level protections[.]" *Id.* ¶ 91.

HHS argues (p. 2) that these harms are insufficient because Plaintiffs already engage in outreach and advocacy as part of their ordinary activities. This argument is legally incorrect: "it is of no consequence that part of the diversion of resources is to . . . activities that are already part of the organization's usual services," as organizations have standing where, as here, "the defendant's conduct or policy interferes with or burdens an organization's ability to carry out its usual activities." *De Dandrade v. U.S. Dep't of Homeland Security*, 367 F. Supp. 3d 174, 182 (S.D.N.Y. 2019). In any event, Plaintiffs' allegations make clear that their responses to HHS's Notice have diverted resources away from other activities. For example, Family Equality's education and outreach campaign on the Notice diverted substantial resources away from "its work to promote the Every Child Deserves a Family Act . . . as well as its work on a variety of other policy issues . . . , such as paid leave, healthcare, and housing." Compl. ¶ 80*; see also* ¶¶ 89, 93 (detailing the activities from which other Plaintiffs have diverted resources).

HHS also argues (p. 3) that these harms amount to nothing more than interference with Plaintiffs' ability to advocate on an issue of interest. Not so. As explained above, the substantial confusion created by the Notice harms Plaintiffs' ability to educate grant recipients and program participants on their legal obligations and rights, causing Plaintiffs to divert resources towards responsive education and outreach campaigns. These harms are sufficient to confer Article III standing. *See Common Cause / New York v. Brehm*, 432 F. Supp. 3d 285, 309 (S.D.N.Y. 2020) (collecting cases where organizations had standing based on a diversion of resources towards educating voters about new voting laws). Similarly, Plaintiffs' efforts to obtain state-level protections also constitute an injury-in-fact. *Cf. id.* at 308-09 (organization has standing when "compell[ed] to devote resources to combatting the effects of [a] law that are harmful to [its] mission"). As the Second Circuit has stated, "so long as the economic effect on an organization is real, the organization does not lose standing simply because the proximate cause of that economic injury is 'the organization's noneconomic interest in encouraging [a particular policy preference].'" *Nnebe*, 644 F.3d at 157.

<u>A Stay Is Unwarranted</u>. When determining whether to stay proceedings, courts consider: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 621

(S.D.N.Y. 2012). These factors are to be balanced, "with the central focus of avoiding prejudice." *Consol. Edison Co. of N.Y. v. United States,* 30 F. Supp. 2d 385, 389 (S.D.N.Y. 1998). The party seeking the stay "bears the burden of establishing its need." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012).

The government has not met this burden. While HHS may ultimately issue a final rule, it has not done so yet; and, as the government acknowledges, OMB may return the rule to HHS for further consideration or modification. *Cf. New York v. U.S. Army Corps of Eng'rs*, 896 F. Supp. 2d 180, 194 (E.D.N.Y. 2012) ("[t]he line between proposed regulations and final regulations may be subtle, but the court believes it is real"). Even if HHS does issue a final rule in the near future, it is also likely that one or more parties will challenge the rule, as the notice of proposed rulemaking drew more than 120,000 public comments.[1] Vacatur of the final rule in litigation would leave the instant challenge ripe for review.

Each of these possibilities is made more likely by the Supreme Court's recent decision in *Bostock v. Clayton Cty., Georgia*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020), which definitively ruled that Title VII of the Civil Rights Act's prohibition of discrimination on the basis of sex in employment necessarily includes discrimination against LGBTQ people. As relevant here, the proposed rule would eliminate the existing prohibition on discrimination on the basis of "age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation" 45 C.F.R. § 75.300(c), and replace it with a prohibition on discrimination by grantees "to the extent doing so is prohibited by statute." 84 Fed. Reg. 63,831-01, 63,832 (Nov. 19, 2019). Many statutes administered by HHS already prohibit discrimination on the basis of sex, but do not specifically include sexual orientation and gender identity or transgender status.[2] At a minimum HHS should revisit the rule to address *Bostock*—namely to clarify that, for each of the statutes it administers, prohibited sex discrimination includes discrimination against LGBTQ people; or if it declines this legally correct application of *Bostock*, to provide an explanation as to the purported basis for distinction. HHS should also reconsider leaving the 2016 Rule, which is consistent with *Bostock's* analysis of discrimination, in place.

In the meantime, the Notice of Nonenforcement has injured Plaintiffs and will continue to injure them, making any stay prejudicial. Conversely, the government has identified no prejudice to itself from proceeding with litigation, other than the time required to defend this matter, likely a limited burden given that this is a record review case. This is hardly the showing of a "clear case of hardship or inequity" required given the "fair possibility that the stay … will work damage" to plaintiffs. *Landis v. N. Am. Co*., 299 U.S. 248, 255 (1936). As to the remaining factors, the Court "has an interest in advancing its docket" through the orderly procession of litigation. *Citibank, N.A. v. Super Sayin' Pub., LLC*, 86 F. Supp. 3d 244, 248 (S.D.N.Y. 2015). And the interests of the public would be well served by advancing the litigation because the Notice of Nonenforcement currently invites unlawful discrimination against LGBTQ recipients of services, and creates confusion as to grant recipients' obligations under the various grant programs. *See*, *e.g.*, Compl. ¶¶ 75, 78, 86.

---

[1] https://www.regulations.gov/document?D=HHS-OS-2019-0014-0001.
[2] https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html.

Sincerely,

*/s/ Robin Thurston*

Robin Thurston
Democracy Forward Foundation
1333 H Street NW Suite 1100
Washington, DC 20005
(202) 448-9090
rthurston@democracyforward.org

*Counsel for Plaintiffs*

CC: All Counsel of Record (by ECF)