UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

FAMILY EQUALITY; TRUE COLORS
UNITED, INC.; and SERVICES &
ADVOCACY FOR GLBT ELDERS,

                    Plaintiffs,

            v.                                                    20 Civ. 2403 (MKV)

ALEX M. AZAR II, in his official capacity
as Secretary, United States Department of
Health and Human Services; and THE UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

                    Defendants.


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**


                                                    AUDREY STRAUSS
                                                    Acting United States Attorney for the
                                                    Southern District of New York
                                                    86 Chambers Street, Third Floor
                                                    New York, New York 10007

JENNIFER C. SIMON
Assistant United States Attorney
        *Of Counsel*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................... 1

BACKGROUND ............................................................................................................... 2

I.      Statutory and Regulatory Background ................................................................. 2

II.     The Complaint ..................................................................................................... 5

ARGUMENT ................................................................................................................... 7

I.      Plaintiffs Lack Standing ...................................................................................... 7

        A.      Article III Standing ................................................................................. 8

        B.      Statutory Standing ................................................................................. 13

II.     A Stay of This Action Is Warranted .................................................................. 14

III.    CONCLUSION ................................................................................................... 16

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Shipping Line v. Massan Shipping*,
    885 F. Supp. 499 (S.D.N.Y. 1995) ...................................................................... 14

*Association of Data Processing Service Orgs. v. Camp*,
    397 U.S. 150 (1970) .......................................................................................... 13

*Buck v. Gordon*,
    429 F. Supp. 3d 447 (W.D. Mich. 2019) ............................................................... 3

*Clarke v. Sec. Indus. Ass'n*,
    479 U.S. 388 (1987) ..................................................................................... 13, 14

*Ctr. for Law & Educ. v. Dep't of Educ.*,
    396 F.3d 1152 (D.C. Cir. 2005) ......................................................................... 11

*Ctr. for Reprod. Law & Policy v. Bush*,
    304 F.3d 183 (2d Cir. 2002) .............................................................................. 14

*Havens Realty Corp.*,
    455 U.S. 363 (1982) ............................................................................................ 9

*John v. Whole Foods Market Group, Inc.*,
    858 F.3d 732 (2d Cir. 2017) ................................................................................ 7

*Kappel v. Comfort*,
    914 F. Supp. 1056 (S.D.N.Y. 1996) ................................................................... 15

*Knox v. Serv. Emps. Int'l Union*,
    567 U.S. 298 (2012) .......................................................................................... 15

*Landis v. North American Co.*,
    299 U.S. 248 (1936) .......................................................................................... 14

*LaSala v. Needham & Co., Inc.*,
    399 F. Supp. 2d 421 (S.D.N.Y. 2005) .......................................................... 14, 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) .......................................................................................... 13

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) ............................................................................................ 8

*N.Y. Civil Liberties Union v. N.Y. City Trans. Auth.* ("NYCLU"),
    684 F.3d 286 (2d Cir. 2012) ................................................................................ 8

*Olsen v. Stark Homes*,
    759 F.3d 140 (2d Cir. 2014) ............................................................................... 10

*Owen v. Regence Bluecross Blueshield of Utah*,
    388 F. Supp. 2d 1318 (D. Utah 2005) ................................................................. 16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012). ........................................................................................... 13

*Salazar v. King*,
    822 F.3d 61 (2d Cir. 2016) .................................................................................... 7

*Sierra Club v. Morton*,
    405 U.S. 727 (1972) .............................................................................................. 8

*Sikhs for Justice v. Nath*,
    893 F. Supp. 2d 598 (S.D.N.Y. 2012) ................................................................ 14

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*,
    454 U.S. 464 (1982) ............................................................................................ 13

*Volmar Distrib. v. N.Y. Post Co.*,
    152 F.R.D. 36 (S.D.N.Y. 1993) .......................................................................... 14

*Washington v. Trump,*
    276 F. Supp. 3d 174 (S.D.N.Y. 2017) .......................................................... 10, 12

## Statutes and Regulations

5 U.S.C. § 601 ................................................................................................................ 3

34 U.S.C. § 11201 ........................................................................................................ 14

42 U.S.C. § 670 ............................................................................................................ 13

45 C.F.R. § 75.102 ......................................................................................................... 2

45 C.F.R. § 75.300 .............................................................................................*passim*

45 CFR 75.100 ............................................................................................................... 2

45 C.F.R. § 1351.22 ..................................................................................................... 12

81 Fed. Reg. 89393 ........................................................................................................ 2

84 Fed. Reg. 63809 ........................................................................................................ 3

Defendants United States Department of Health and Human Services ("HHS"), and Alex M. Azar, in his official capacity as Secretary of HHS, by their attorney Audrey Strauss, Acting United States Attorney for the Southern District of New York, respectfully submit this memorandum of law in support of their motion to dismiss the Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1), or, in the alternative, for a stay.

<h3 align="center">PRELIMINARY STATEMENT</h3>

In this Administrative Procedure Act ("APA") action, Plaintiffs challenge the issuance by HHS of a notification stating that it would not enforce certain regulatory provisions relating to non-federal entities that receive grants from HHS, while the agency sought to amend such regulations. Dismissal is warranted because Plaintiffs lack both constitutional and statutory standing to pursue such claims. In the alternative, a brief stay of this action is warranted pending the promulgation of the relevant amendments.

Plaintiffs lack constitutional standing because they fail to demonstrate an injury in fact; they have not demonstrated that HHS's decision not to enforce the regulations in question impedes their activities or has caused them to divert resources to other activities in which they are not currently engaged. Instead, Plaintiffs have only alleged a disagreement with a policy they view as adverse to their advocacy interests, which is not enough to assert standing and to bring this claim. Plaintiffs also do not meet the standard for statutory standing because they do not adequately allege that their interests fall within the relevant "zone of interests; Plaintiffs have not shown that any of the statutes they invoke were intended to protect the advocacy activities of organizations.

In the alternative, the Court should exercise its discretion to stay this matter. HHS submitted the anticipated final rule – a rule which would replace the grants regulation at issue and make the challenged nonenforcement decision moot – to the Office of Management and Budget ("OMB") for review on May 26. Executive Order ("EO") 12,866 contemplates that, barring extensions, OMB's

review will be limited to 90 days, *i.e.* August 26, 2020.  A brief stay would not impose any

prejudice on Plaintiffs and would conserve the resources of both the courts and the parties.

BACKGROUND

**I.      Statutory and Regulatory Background**

Regulations governing awards of grants by HHS to non-federal entities are set forth in 45

C.F.R. Part 75.  *See* 45 CFR 75.100(a)(1).  These grant regulations in turn reflect HHS's

implementation of the Uniform Administrative Requirements, Cost Principles, and Audit

Requirements for Federal Awards ("UAR" or "uniform regulations") set forth in the guidance

issued by the Office of Management and Budget (OMB) on December 26, 2013, and subsequent

amendments.  Among other changes, on December 12, 2016, HHS amended § 75.300 by adding

paragraphs (c) and (d) as follows:

> (c) It is a public policy requirement of HHS that no person otherwise eligible will
> be excluded from participation in, denied the benefits of, or subjected to
> discrimination in the administration of HHS programs and services based on non-
> merit factors such as age, disability, sex, race, color, national origin, religion,
> gender identity, or sexual orientation.  Recipients must comply with this public
> policy requirement in the administration of programs supported by HHS awards.

> (d) In accordance with the Supreme Court decisions in *United States v. Windsor*
> and in *Obergefell v. Hodges*, all recipients must treat as valid the marriages of
> same-sex couples. This does not apply to registered domestic partnerships, civil
> unions or similar formal relationships recognized under state law as something
> other than a marriage.

81 Fed. Reg. 89393, 89395 (the "2016 Grants Rule").  A separate regulation authorizes the agency

to issue "[e]xceptions on a case-by-case basis" from this and other grant regulations.  *See* 45 C.F.R.

§ 75.102(b).

After HHS's grant regulations were amended to include § 75.300(c) and (d), various

lawsuits concerning these provisions were commenced.  In *Texas v. Azar*, No. 19 Civ. 0365 (S.D.

Tex.), plaintiffs challenged § 75.300(c) and (d) on the grounds that, among other things, the

2

regulations violate the Religious Freedom Restoration Act ("RFRA") and the First Amendment.[1]  In

*Rogers v. HHS*, 19 Civ. 01567 (D.S.C.), and *Maddonna v. U.S. Dep't of Health & Human Servs.*, 19

Civ. 448 (D.S.C.), plaintiffs challenged HHS's decision to issue South Carolina's Title IV-E Foster

Care program a conditional exception, pursuant to § 75.102(b), from the religious non-

discrimination requirement set forth in § 75.300(c) insofar as South Carolina sought to use federal

funds to reimburse certain faith-based organizations that provide services. In *Buck* v. *Gordon*, No.

1:19-cv-286 (W.D. Mich.), the court preliminarily enjoined HHS from enforcing § 75.300(c) in

Michigan as to a particular subgrantee.  *See Buck v. Gordon*, 429 F. Supp. 3d 447 (W.D. Mich.

2019); *see also Buck v. Gordon*, No. 19-2185, 2019 U.S. App. LEXIS 34421, at *3 (6th Cir. Nov.

19, 2019) (denying stay of same preliminary injunction).

On November 19, 2019, HHS issued the notice at issue in this litigation.  *See* HHS,

Notification of Nonenforcement of a Health and Human Services Grants Regulation, 84 Fed. Reg.

63809 (Nov. 19, 2019) (the "Notice of Nonenforcement").  Among other things, the Notice of

Nonenforcement stated that HHS would not enforce various provisions contained in Part 75,

including the provisions at issue here, until the provisions had been repromulgated to address

concerns about compliance with the requirements of the Regulatory Flexibility Act ("RFA"), 5

U.S.C. 601, *et seq*.  In particular, HHS expressed concern that it had failed to perform a proper RFA

analysis or certify that the economic impact on "small entities" would not be "significant."  84 Fed.

Reg. at 63,809-11.  Rather than exempt only "small entities" from enforcement on this basis, HHS

exercised its discretion not to enforce the regulations as to any entities, having determined that

"[a]pplying these rules differently to agency grantees depending on size would be unfair, create

---

[1] On August 5, 2020, the District Court of the Southern District of Texas entered an Opinion and Order granting the Government's motion to dismiss the action as moot in light of HHS's issuance of the Notice of Nonenforcement.  *See Texas v. Azar*, No. 19 Civ. 0365 (S.D. Tex.), Dkt. No. 44.

increased compliance costs for all entities as they seek to determine whether they are or are not still subject to the rules, and impose additional administrative burdens on the Department disproportionate to the benefit of enforcement." *Id.*

On the same day as the Notice of Nonenforcement was published, HHS also issued a notice of proposed rulemaking to amend the same provisions that were the subject of the Notice of Nonenforcement. *See* HHS, Notice of Proposed Rulemaking, 84 Fed. Reg. 63,831 (Nov. 2019) (the "2019 NPRM"). Therein, HHS proposed to revise § 75.300(c) to state, "[i]t is a public policy requirement of HHS that no person otherwise eligible will be excluded from participation in, denied the benefits of, or subjected to discrimination in the administration of HHS programs and services, to the extent doing so is prohibited by federal statute." *Id.* at 63,832. HHS proposed that this revision would simplify compliance by avoiding potential conflicts between statutory requirements, such as RFRA, and HHS public policy requirements. *Id.* at 63,833. HHS also expressed concern about the possibility that subgrantees with religious objections to certain aspects of section 75.300(c) could leave federally supported programs in the absence of this change, "likely reduc[ing] the effectiveness of programs funded by federal grants by reducing the number of entities available to provide services under these programs." *Id.* at 63,832. In addition, HHS proposed to revise § 75.300(d) to state, "HHS will follow all applicable Supreme Court decisions in administering its award programs." *Id.* at 63835.

The comment period for the 2019 NPRM ended in December 2019, and HHS then considered these comments in drafting a final rule. Pursuant to Executive Order ("EO") 12,866, on or about May 26, 2020, HHS submitted the rule to OMB for review. Absent an extension or return to the agency, OMB's review period extends until August 26, 2020. *See* EO 12,866, § 6(b)(2)(B).[2]

---

[2] The review process may be extended once, by no more than 30 calendar days, upon the written approval of the Director of OMB. *See* EO 12866, § 6(b)(2)(C). In addition, the OMB has the

**II.** **The Complaint**

On March 19, 2020, Plaintiffs commenced this action.  Plaintiffs assert three claims under the APA, namely (1) that HHS impermissibly promulgated the Notice of Nonenforcement without undertaking notice-and-comment rulemaking, (2) that the Notice of Nonenforcement is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law because the agency was mistaken that the 2016 Grants Rule did not comply with the RFA, and (3) that the Notice of Nonenforcement is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law because Defendants failed to provide a reasoned explanation for the Notice of Nonenforcement.  *See* Am. Compl. ¶¶ 94-109.  Plaintiffs seek, among other things, a declaration that the Notice of Nonenforcement violated the APA and vacatur of the notice.

As is relevant to the question of standing, Plaintiff Family Equality asserts that it "is a nonprofit, nonpartisan organization" whose "mission is to advance legal and lived equality for LGBTQ families."  Am. Compl. ¶ 9.  It asserts that it advances this mission "by working to ensure that adoption and foster care services, including those funded by HHS grant programs, are free from discrimination."  *Id.*  Specifically, Family Equality states that it (1) "conducts outreach and education to LGBTQ families and support groups to ensure that those families understand their rights and are empowered to advocate for themselves," and (2) "works on the federal and state levels to ensure that adoption and foster care services do not discriminate against LGBTQ youth in need of homes or LGBTQ adults seeking to become parents or guardians."  *Id.* ¶ 10.  Family Equality alleges that it "relied on HHS's 2016 Grants Rule to help ensure that adoption and foster care service providers do not discriminate against LGBTQ youth in the child welfare system or LGBTQ adults who are potential foster or adoptive parents."  *Id.* ¶ 11.

_____

option of returning some or all of the provisions of the rule to the agency for further consideration. *Id.* § 6(b)(3).

Plaintiff True Colors United asserts that it is a "is a nonprofit, nonpartisan organization" providing advocacy and direct services.  *Id.* ¶ 12.  It asserts that its mission "is to implement innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people."  *Id.*  It asserts that it advances this mission by "working to end youth homelessness and to ensure that homelessness services, many of which are funded through HHS grant programs, are safe for LGBTQ youth."  *Id.*  Specifically, True Colors United asserts that it (1) "offers free training, education, and technical assistance programs to homelessness service providers in order to ensure that LGBTQ youth experiencing homelessness have access to safe and supportive services, and to increase the likelihood that youth homelessness is rare and brief;" (2) "works at the federal, state, and local levels to promote funding, policies, systems, and protections that meet the needs of LGBTQ youth experiencing homelessness," and (3) "provides LGBTQ youth experiencing homelessness with leadership development opportunities."  *Id.* ¶ 13.  The organization alleges that it "had relied on HHS's non-discrimination requirements in educating and training recipients of HHS's Runaway and Homeless Youth grant awards about the importance of providing services that are safe for LGBTQ youth."  *Id.* ¶ 14.  For instance, the organization alleges it "educated service providers on the federal non-discrimination protections when presenting at conferences."  *Id.*

Plaintiff SAGE asserts that it is "a nonprofit, nonpartisan organization" providing national advocacy and services.  *Id.* ¶ 15.  It asserts its mission is "to allow LGBTQ older people to age with respect and dignity."  *Id.*  Specifically, SAGE asserts that it (1) "runs the National Resource Center on LGBT Aging, a technical assistance resource center aimed at improving the quality of services and supports offered to LGBTQ older people;" (2) "provides training to long-term care providers and senior housing providers in how to work effectively, respectfully, and in a non-discriminatory manner with LGBTQ older people;" (3) "provides direct services to LGBTQ older people in New York City through its 'SAGE Centers,' where LGBTQ older people may obtain meals, access social

and cultural programming, and gain assistance with obtaining a variety of aging services;" (4) "has established a housing initiative under which it has partnered with other organizations to support the construction of LGBTQ-friendly elder housing across the country and to build the first LGBTQ-friendly elder housing in New York;" and (5) works at the federal- and state-levels to ensure that policies, systems, and protections are in place to meet the needs of LGBTQ older people." *Id.* ¶ 16. SAGE alleges that it "had relied on HHS's nondiscrimination requirements to help ensure that service providers who receive funds under the Older Americans Act do not discriminate against LGBTQ older people," and that this "allowed SAGE to focus its policy efforts on securing affirmative protections for LGBTQ older people in other contexts, such as long-term care facilities." *Id.* ¶ 17.

## ARGUMENT

### I.       Plaintiffs Lack Standing

"To bring a claim under the APA, a plaintiff must satisfy Article III's standing requirements (constitutional standing) and assert interests that are arguably within the zone of interests to be protected or regulated by the statute she claims was violated (statutory standing)." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016). Plaintiffs fail to demonstrate either constitutional standing or statutory standing. With respect to constitutional standing, Plaintiffs fail to establish a cognizable injury in fact; instead their allegations reflect a policy disagreement with the challenged Notice of Nonenforcement. With respect to statutory standing, Plaintiffs have not demonstrated that they are within the relevant "zone of interests." Where plaintiffs lack standing, the district court lacks subject matter jurisdiction and the complaint must be dismissed. *See John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 735 (2d Cir. 2017).

A.      **Article III Standing**

To satisfy the "irreducible constitutional minimum of standing," a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id. at* 736 (quotation marks omitted); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  To establish organizational standing, an organizational plaintiff "is just another person—albeit a legal person—seeking to vindicate a right.  To qualify, the organization itself must meet the same standing test that applies to individuals."  *N.Y. Civil Liberties Union v. N.Y.C. Trans. Auth.*, 684 F.3d 286, 294 (2d Cir. 2012) (alterations and quotation marks omitted).[3]

An injury in fact may not be based on an entity's "mere interest in a problem, no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem."  *Sierra Club v. Morton*, 405 U.S. 727, 739 (1972).  Rather, as set forth in *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, an organization must demonstrate a "perceptible impairment" of its activities sufficient to meet the "injury-in-fact" requirement in one of two ways.  Either an organization must show that a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities, 868 F.3d 104, 110 (2d Cir. 2017) (citing *N.Y. Civil Liberties Union,* 684 F.3d at 295), or the organization must show that it has "divert[ed] its resources away from its current activities[.]"  868 F.3d at 111.  Plaintiffs do not meet either of these requirements.

Here, Plaintiffs fail to show that the Notice of Nonenforcement impedes their ability to carry out their activities or has caused them to divert resources.  Although Plaintiffs each allege generally

---

[3] Plaintiffs do not contend they have associational standing on behalf of any members of their organizations.

that the Notice of Nonenforcement "impedes" their ability to accomplish their ordinary activities[4] and purport to identify various ways in which the Notice of Nonenforcement has caused them to "divert" resources, they fail to identify an injury that is anything more than a policy decision with which they disagree.

For instance, Plaintiffs assert that the Notice of Nonenforcement has caused them to devote resources to education and outreach specifically to combat alleged "confusion" caused by the notice. True Colors United alleges that "the Notice of Nonenforcement introduces substantial confusion regarding the legal obligations of grant recipients," and that this "confusion" has "required True Colors United to conduct an education and outreach campaign to ensure that service providers receiving Runaway and Homeless Youth grant funds understand their existing obligations not to discriminate against LGBTQ youth." Am. Compl. ¶¶ 86, 87. Plaintiff Family Equality asserts that it is, among other similar activities, "conducting a widespread and comprehensive education and outreach campaign to ensure that LGBTQ youths and families understand the full impact of HHS's nonenforcement action." *Id.* ¶ 79. And SAGE asserts that it "will continue to conduct an education and outreach campaign" regarding the impact of the Notice of Nonenforcement that, in its view, is necessary to "to combat the confusion caused by the Notice of Nonenforcement." *Id.* ¶ 92. But these education and outreach campaigns are precisely the sort of work Plaintiffs engaged in before the Notice of Nonenforcement, as particularly evidenced by SAGE's acknowledgement that it is merely "continu[ing]" such efforts. The diversion-of-resources

---

[4] *See* Am. Compl. ¶ 77 (alleging that the notice "conflicts with, impairs, and frustrates Family Equality's mission and activities by impeding its ability to ensure that foster care and adoption services are safe for LGBTQ youth and non-discriminatory for LGBTQ potential parents and guardians."); *id.* ¶ 82 ("The Notice conflicts with, impairs, and frustrates True Colors United's mission and activities by impeding its ability to ensure that homelessness services are safe for LGTBQ youth and more broadly, to end youth homelessness."); *id.* ¶ 90 ("[T]he Notice also conflicts with, impairs, and frustrates SAGE's mission and activities by impeding its ability to ensure that LGBTQ older people are able to age with dignity.").

theory requires that a defendant's actions "divert" the entity's resources away from its "other current activities"—that is, the challenged conduct must make the plaintiff do something new and different with its resources than what it had been doing previously.  *See Centro*, 868 F.3d at 110-11 (diversion-of-resources requirement was satisfied because anti-solicitation ordinance required plaintiff entity to reallocate money from other activities to pay the new and increased costs of reaching laborers); *Havens Realty Corp.*, 455 U.S. 363, 379 (1982) (housing entity had organizational standing because it diverted resources from client counseling and referral services to new efforts to identify and counteract defendants' racially discriminatory practices); *Olsen v. Stark Homes*, 759 F.3d 140, 158 (2d Cir. 2014) (same).

Here, Plaintiffs merely "continue" to engage in the same outreach and education activities. That the specific subject matter of their education or outreach efforts has changed is not a diversion of resources sufficient to establish standing as the "purported injuries are not sufficiently distinct from the general missions of the organizations at issue."  *Ctr. for Food Safety v. Price*, No. 17 Civ. 3833 (VSB), 2018 U.S. Dist. LEXIS 155794, *14 (S.D.N.Y. Sept. 12, 2018); *see also Citizens for Responsibility & Ethics in Washington v. Trump,* 276 F. Supp. 3d 174, 191-92 (S.D.N.Y. 2017) (*vacated and remanded on other grounds*, 953 F. 3d 178 (2d Cir. 2019), *as amended,* No. 18-474, 2020 U.S. App. LEXIS 8791 (2d Cir. Mar. 20, 2020) (finding no standing where plaintiff "is . . . not wasting resources by educating the public and issuing statements concerning the effects of Defendant's alleged constitutional violations . . . [because] this is exactly how an organization like [plaintiff] spends its resources in the ordinary course.").

Along the same lines, Plaintiffs allege that they have been impeded in their efforts to pursue their mission because the 2016 Grants Rule was a "tool" they used in support of their various activities and assert that the loss of this tool impedes their activities.  For instance, Plaintiff Family Equality alleges that it was able to use the 2016 Grants Rule as a "tool" to "defeat proposed

legislation in states throughout the country."  Am. Compl. ¶ 81.  Without this, the organization

asserts that its efforts will be "less effective."  *Id.* ¶ 82.  True Colors United asserts it "previously

relied upon the 2016 Grants Rule to educate service providers on the importance of not

discriminating against LGBTQ youth," and that "[w]ithout that tool," its educational efforts will be

less effective.  *Id.* ¶ 83.

This alleged loss of an ability to rely on the substance of a particular regulation, as opposed

to some other authority, again does not identify any impediment to an organization's activities or a

diversion of resources.  While this consequence of the Notice of Nonenforcement reflects Plaintiffs'

"interest in a problem," this is not sufficient to confer standing.  *Ctr. for Law & Educ. v. Dep't of

Educ.*, 396 F.3d 1152, 1162 n.4 (D.C. Cir. 2005) (internal quotation marks omitted).  Nor would

finding standing be logical.  Under Plaintiffs' approach, *any* significant change in a regulation of

interest to an organization would give standing to that organization, since the change would

necessitate reworking educational materials, potentially altering the legal bases for its advocacy

efforts, and so forth.

Two of the Plaintiffs also argue that the Notice of Nonenforcement forces them to focus

their outreach and advocacy efforts at the state level, as opposed to the federal level, and they assert

that this is more time consuming and has caused them to divert resources from other efforts.  SAGE,

for instance, asserts that its efforts in response to the Notice of Nonenforcement have "diverted

valuable staff time and resources away from SAGE's other projects, including, for example, its

work to secure state-level non-discrimination protections in other contexts, such as in long-term

care facilities."  Am. Compl. ¶ 93.  True Colors United asserts that the Notice of Nonenforcement

will result in a diversion of efforts to "new state-level work in 2020" in lieu of other advocacy work.

*Id.* ¶ 88.  The organization alleges that, but for the Notice of Nonenforcement, it had "planned on a

radically different 'capacity-building' agency, which would have included conducting regional

summits[.]" *Id.* ¶ 89.[5]

To begin, allegations that the Plaintiffs are focusing on state level advocacy, as opposed to federal, is wholly insufficient to confer standing. *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1158, 1161-62 (D.C. Cir. 2005) (organization did not have standing where it was forced to change method of "address[ing] advocacy issues [to] an expensive State-by-State basis"). But, in any case, Plaintiffs themselves acknowledge that both federal and state level work was already a part of their core activities prior to the issuance of the Notice of Nonenforcement. *See* Am. Compl. ¶ 10 (Family Equality's activities "involve[] securing affirmative protections at the federal *and state level* and working to stop or repeal policies that allow for discrimination, such as license-to-discriminate laws that allow providers to discriminate in the name of religion.") (emphasis added); *id.* ¶ 13 ("True Colors United works at the federal, *state, and local levels* to promote funding, policies, systems, and protections that meet the needs of LGBTQ youth experiencing homelessness, including protections from discrimination, as well as affirmation and support related to all aspects of these youths' identities, including sexual orientation, gender identity, and gender expression.") (emphasis added); *id.* ¶ 16 ("SAGE works at the federal- and state-levels to ensure that policies, systems, and protections are in place to meet the needs of LGBTQ older people."). Plaintiffs simply do not show that the Notice of Nonenforcement causes any of them to do something sufficiently different with their resources than what they had been doing in the past to establish Article III standing. Nor are Plaintiffs' decisions about the allocation of resources between different areas of law, whether state or federal, sufficient to establish standing. *See Citizens for Responsibility & Ethics in Wash. v. Trump*, 276 F. Supp. 3d at 191 (no standing where an organization's decision to

---

[5] Plaintiff Family Equality, on the other hand, asserts the inverse, claiming that its public outreach and education campaign relating to the Notice of Nonenforcement diverts resources *from* its state work to this federal work. *See* Am. Compl. ¶ 80.

expend resources was "a choice about where and how to allocate its resources—one that almost all organizations with finite resources have to make").[6]

## B. Statutory Standing

Not only do Plaintiffs lack Article III standing, they also lack statutory standing. Statutory standing requires that a "plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982) (quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)). "Whether a plaintiff comes within 'the 'zone of interests' is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014). A court "do[es] not ask whether . . . Congress should have authorized [a plaintiff 's] suit, but whether Congress in fact did so." *Id.* at 128.

In order to bring suit under the APA, plaintiffs must allege that their interest is "arguably within the zone of interests to be protected or regulated by the statute that [they] say[] was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153) (internal quotation marks omitted). Although this test "is not meant to be especially demanding," a plaintiff does not fall within the zone of interests if its interests are "so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987).

---

[6]  Plaintiffs' argument is particularly weak as it relates to True Colors United's standing because, as Plaintiffs acknowledge, the Runaway and Homeless Youth Act contains equivalent anti-discrimination provisions as those set forth in the 2016 Grants Rule. *See* 45 C.F.R. 1351.22(a).

Here, Plaintiffs do not fall within the "zone of interests" of the grant programs they reference, such as those established by Title IV-E of the Social Security Act, the Older Americans Act, or the Runaway and Homeless Youth Act.[7]  These programs protect the rights and interests of individuals, not advocacy organizations, let alone the interests of that such organizations have in the efficient use of their resources.  Such interests are "so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assume that Congress intended to permit the suit." *Sec. Indus. Ass'n*, 479 U.S. at 399.  It cannot be assumed that Congress intended to authorize suits by these organizational plaintiffs; rather, Plaintiffs are attempting to assert the statutory rights of third party individuals.  The zone of interests test forecloses such a claim.  *See Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002).  Accordingly, Plaintiffs lack statutory standing.

## II.      A Stay of This Action Is Warranted

District courts "have the power to stay proceedings." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 621 (S.D.N.Y. 2012).  This power "is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *Landis v. North American Co.*, 299 U.S. 248, 254 (1936).  "[T]he decision whether to issue a stay is [therefore] 'firmly within a district court's discretion.'" *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) (quoting *Am. Shipping Line v. Massan Shipping*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)).  To determine whether a stay is appropriate, courts typically consider:

---

[7] Title IV-E of the Social Security Act was established "[f]or the purpose of enabling each State to provide . . . foster care and transitional independent living programs for children who otherwise would have been eligible for assistance under the State's plan[,] . . . adoption assistance for children with special needs, kinship guardianship assistance, and prevention services or programs[.]" 42 U.S.C. § 670.  The objectives of the Older Americans Act, 42 U.S.C. § 3001 *et seq.*, include the provision of services to individuals who are 60 years of age or older. *Id.*  The Runaway and Homeless Youth Act seeks to provide services to young people who have become homeless. *See* 34 U.S.C. § 11201.

> (1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest.

*Sikhs for Justice*, 893 F. Supp. 2d at 621; *see also Finn v. Barney,* No. 08 Civ. 2975, 2008 U.S. Dist. LEXIS 101509, at *5 (S.D.N.Y. Dec. 8, 2008) (quoting *Volmar Distrib. v. N.Y. Post Co.*, 152 F.R.D. 36, 39 (S.D.N.Y. 1993)); *LaSala*, 399 F. Supp. 2d at 427; *Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996).  "In balancing these . . . factors on a case-by-case basis, 'the basic goal is to avoid prejudice.'"  *LaSala*, 399 F. Supp. 2d at 427 (quoting *Kappel*, 914 F. Supp. at 1058).

Here, the relevant factors weigh strongly in favor of staying this matter.  The shortly-anticipated new rule will plainly render Plaintiffs' challenge to the Notice of Nonenforcement – which relates only to the 2016 Grants Rule – moot.[8]  As noted above, HHS has submitted a final amended § 75.300(c) and (d) to OMB for review.  Staying this action briefly until the new rule is promulgated will cause little to no prejudice to Plaintiffs, whereas proceeding with the case will place undue burdens on the Government, both in the form of unnecessary litigation, as well as the potentially disruptive effect on the administration of its grants programs.  Moreover, it would hardly be "an orderly and efficient use of judicial resources" to proceed with litigation on the merits of Plaintiffs' claims under these circumstances.  Not only will judicial resources be conserved by staying this action pending the promulgation of the new rule, but the interests of nonparties and the public are also served well by minimizing the amount of time and resources spent by the court on

---

[8] A case is moot "when it is impossible for a court to grant any effectual relief whatever to the prevailing party."  *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotations omitted).

duplicative litigation and minimizing needless disruption to the grants regulations in light of the anticipated new rule.

Plaintiffs' speculation that "[e]ven if HHS does issue a final rule in the near future, it is . . . likely that one or more parties will challenge the rule" and that "[v]acatur of the final rule in litigation would leave the [Notice of Nonenforcement] ripe for review," *see* Dkt. No. 31 at 3, does not alter this analysis.  Whether or not Plaintiffs' claims would be, as they assert, "ripe for review" under these conditions – i.e., *if* a third party challenges the rule, and *if* that third party is successful on the merits, and *if* a court determines that the appropriate relief is vacatur – is of no moment. Even if all of these contingencies arise, Plaintiffs' challenge to the Notice of Nonenforcement will still be moot upon HHS's issuance of the new rule.  Plaintiffs – challenging a notice that relates only to the 2016 version of the grants regulation – will no longer be able to articulate any case or controversy when that notice is no longer in effect.  *See Texas v. Azar*, No. 19 Civ. 0365 (S.D. Tex. Aug. 5, 2020), Dkt. No. 44 at 15 (As to "plaintiffs['] worry that a change in the presidential administration or development in related litigation in other jurisdictions may cause the HHS to change course[,] . . . . that does not change the answer to the mootness question today.") (citing *Owen v. Regence Bluecross Blueshield of Utah*, 388 F. Supp. 2d 1318, 1324 (D. Utah 2005)).

## CONCLUSION

For the foregoing reasons, this Court should grant Defendants' motion to dismiss the Complaint, or, in the alternative, stay this action pending HHS's promulgation of the amended grants regulation.

Dated: New York, New York
       August 7, 2020

                              Respectfully submitted,

                              AUDREY STRAUSS
                              Acting United States Attorney of the
                              Southern District of New York

                    By:       _____
                              JENNIFER C. SIMON
                              Assistant United States Attorney
                              86 Chambers Street, Third Floor
                              New York, New York 10007
                              Tel.: (212) 637-2746
                              E-mail: Jennifer.Simon@usdoj.gov