**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| FAMILY EQUALITY; TRUE COLORS UNITED, INC.; and SERVICES AND ADVOCACY FOR GLBT ELDERS<br><br>*Plaintiffs*,<br><br>v.<br><br>ALEX M. AZAR II, in his official capacity as Secretary, United States Department of Health and Human Services; and the UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>*Defendants*. | Civil Action No. 20-cv-2403 (MKV) |

<u>**MEMORANDUM IN SUPPORT OF**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**</u>

Kristen Miller (D.C. Bar No. 220627)*
Robin Thurston (D.C. Bar No. 1531399)*
Sean Lev (D.C. Bar No. 449936)*
Jeffrey B. Dubner (NY Bar No. 4974341)
Democracy Forward Foundation
1333 H St. N.W.
Washington, DC 20005
(202) 601-2483
kmiller@democrcayforward.org
rthurston@democracyforward.org
slev@democracyforward.org
jdubner@democracyforward.org

M. Currey Cook (NY Bar No. 4612834)**
Lambda Legal
120 Wall St., 19th Fl.
New York, New York 10005
(212) 809-8585
ccook@lambdalegal.org

Sasha Buchert (OR Bar No. 070686)**
Lambda Legal
1776 K Street N.W., 8th Floor
Washington, DC 20006-2304
(202) 804-6245
sbuchert@lambdalegal.org

*admitted *pro hac vice*
**pro hac vice* application forthcoming

*Counsel for Plaintiffs*

**TABLE OF CONTENTS**

Introduction ........................................................................................................................1

Background........................................................................................................................2

    I.      Legal Background................................................................................................2

    II.     Grant Programs Impacted by the Notice of Nonenforcement......................................4

    III.    Plaintiffs' Harms From the Notice of Nonenforcement ...............................................6

Standard of Review ...........................................................................................................8

    I.      Federal Rule of Civil Procedure 12(b)(1) ..............................................................8

    II.     Federal Rule of Civil Procedure 12(b)(6) ................................................................9

Argument...........................................................................................................................9

    I.      Plaintiffs Have Standing ...................................................................................9

    II.     Plaintiffs Fall Within the Applicable Zones of Interest ...........................................15

       A.  Plaintiffs are within the zone of interests of the 2016 Grants Rule...........................16

       B.  Plaintiffs are also within the zone of interests of the grants programs ......................17

    III.    A Stay is Not Warranted ...................................................................................20

Conclusion.......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Acad. of Pediatrics v. FDA,*
  379 F. Supp. 3d 461 (D. Md. 2019) .................................................................22

*An Giang Agric. & Food Imp. Exp. Co. v. U.S.,*
  350 F. Supp. 2d 1162 (Ct. Int'l Trade 2004) .......................................................21

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ..........................................................................................9

*Bell Atl. Corp. v. Twombly,*
  550 U.S. 544 (2007) ..........................................................................................9

*Bostock v. Clayton County, Georgia,*
  No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020) ..................................23, 24

*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg,*
  290 F.R.D. 409 (S.D.N.Y 2012) ........................................................................11

*Carter v. HealthPort Tech., LLC,*
  822 F.3d 47 (2d Cir. 2016) .................................................................................9

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay,*
  868 F.3d 104 (2d Cir. 2017) ............................................................... 10, 11, 12, 15

*Citibank, N.A. v. Super Sayin' Publ'g, LLC,*
  86 F. Supp. 3d 244 (S.D.N.Y. 2015)...................................................................25

*Citizens for Responsibility & Ethics in Washington v. Trump,*
  276 F. Supp. 3d 174 (S.D.N.Y. 2017) (*vacated and remanded on other
  grounds*, 953 F.3d 178 (2d Cir. 2019))................................................................13

*City of Waukesha v. EPA,*
  320 F.3d 228 (D.C. Cir. 2003) ............................................................................9

*Clarke v. Sec. Indus. Ass'n,*
  479 U.S. 388 (1987) ...........................................................................16, 17, 19

*Clinton v. Jones,*
  520 U.S. 681 (1997) ..........................................................................................21

*Consol. Edison Co. of N.Y. v. United States,*
  30 F. Supp. 2d 385 (S.D.N.Y. 1998).....................................................................21

*Ctr. for Food Safety v. Price*
   No. 17-3833, 2018 WL 4356730 (S.D.N.Y. Sept. 12, 2018) ................................................13

*Ctr. for Law & Educ. v. Dep't of Educ.,*
   396 F.3d 1152 (D.C. Cir. 2005) .....................................................................................14, 15

*Ctr. for Reprod. Law & Policy v. Bush,*
   304 F.3d 183 (2d Cir. 2002) .................................................................................................20

*De Dandrade v. U.S. Dep't of Homeland Sec.,*
   367 F. Supp. 3d 174 (S.D.N.Y. 2019) ...............................................................................2, 11

*Equal Rights Ctr. v. Post Props., Inc.,*
   633 F.3d 1136 (D.C. Cir. 2011) .............................................................................................8

*Exp.-Imp. Bank of U.S. v. Hi-Films S.A. de C.V.,*
   No. 09-3573, 2010 WL 3743826 (S.D.N.Y. Sept. 24, 2010) ...............................................21

*Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons,*
   954 F.3d 118 (2d Cir. 2020) ......................................................................................2, 16, 17

*Friends of Capital Crescent Trail v. Fed. Transit Admin.,*
   No. 17-1811, 2019 WL 1046889 (D.D.C. Mar. 5, 2019) ....................................................16

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ...................................................................................................*passim*

*Hicks v. City of New York,*
   268 F. Supp. 2d 238 (E.D.N.Y. 2003)..............................................................................24, 25

*John v. Whole Foods Mkt. Grp., Inc.,*
   858 F.3d 732 (2d Cir. 2017) ..................................................................................................8

*Kappel v. Comfort,*
   914 F. Supp. 1056 (S.D.N.Y. 1996).....................................................................................21

*Kowalski v. Tesmer,*
   543 U.S. 125 (2004) ............................................................................................................20

*Landis v. N. Am. Co.,*
   299 U.S. 248 (1936) ............................................................................................................24

*LaSala v. Needham & Co.,*
   399 F. Supp. 2d 421 (S.D.N.Y. 2005) .................................................................................21

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) .................................................................................................15, 16, 17

*Louis Vuitton Malletier S.A. v. LY USA, Inc.,*
  676 F.3d 83 (2d Cir. 2012) ....................................................................21

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ...............................................................................8

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ...............................................................................8

*Maiden Creek Assocs. v. U.S. Dep't of Transp.,*
  823 F.3d 184 (3d Cir. 2016) ..................................................................16

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ..........................................................................16, 19

*McDonald v. Piedmont Aviation,*
  625 F. Supp. 762 (S.D.N.Y. 1986) ........................................................25

*Melrose Credit Union v. City of New York,*
  247 F. Supp. 3d 356 (S.D.N.Y. 2017) .....................................................8

*NAACP v. Trump,*
  298 F. Supp. 3d 209 (D.D.C. 2018) .......................................................17

*New York v. Brehm,*
  432 F. Supp. 3d 285 (S.D.N.Y. 2020) ......................................11, 14, 15

*New York v. Dep't of Homeland Sec.,*
  -- F.3d. --, No. 19-3591, 2020 WL 4457951 (2d Cir. Aug. 4, 2020) ...........................*passim*

*New York v. U.S. Army Corps of Eng'rs,*
  896 F. Supp. 2d 180 (E.D.N.Y. 2012) ...................................................22

*Nnebe v. Daus,*
  644 F.3d 147 (2d Cir. 2011) ...........................................................*passim*

*O.A. v. Trump,*
  404 F. Supp. 3d 109 (D.D.C. 2019) .......................................................20

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) .................................................................................3

*Olsen v. Stark Homes, Inc,*
  759 F.3d 140 (2d Cir. 2014) .............................................................12, 13

*In re Par Pharmaceutical, Inc.,*
  133 F.R.D. 12 (S.D.N.Y. 1990) .............................................................20

*Peacock v. Dist. of Columbia,*
   682 F.3d 77 (D.C. Cir. 2012) ........................................................................................... 8

*Raymond Loubier Irrevocable Trust v. Loubier,*
   858 F.3d 719 (2d Cir. 2017) ........................................................................................... 8

*Sikhs for Justice v. Nath,*
   893 F. Supp. 2d 598 (S.D.N.Y. 2012) ........................................................................... 21

*Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc.,*
   886 F. Supp. 1134 (S.D.N.Y. 1995) ........................................................................ 2, 20

*U.S. v. Windsor,*
   570 U.S. 744 (2013) ....................................................................................................... 3

*United States v. Vazquez,*
   145 F.3d 74 (2d Cir. 1998) ............................................................................................ 9

*Warth v. Seldin,*
   422 U.S. 490 (1975) ....................................................................................................... 9

**Statutes**

34 U.S.C. § 11201 ............................................................................................................ 18

42 U.S.C.
   § 670 ............................................................................................................................ 18
   § 671 ............................................................................................................................ 18
   § 3001 .......................................................................................................................... 19

**Other Authorities**

45 C.F.R.
   § 75.300 ..................................................................................................................... 3, 4
   § 75.300(c) .............................................................................................................. 17, 23
   § 75.300(d) ................................................................................................................... 17

81 Fed. Reg. 89393 (Dec. 12, 2016) ........................................................................... *passim*

84 Fed. Reg. 63,831-01 (Nov. 19, 2019) ......................................................................... 23

84 Fed. Reg. 63809 (Nov. 19, 2019) ........................................................................... *passim*

84 Fed. Reg. 63831 (Nov. 19, 2019) ................................................................................. 4

*Discrimination on the Basis of Sex,* HHS (last reviewed Oct. 20, 2019),
   https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html. ...................... 23

Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)....................................................22

*Executive Order Submissions Under Review,* OMB (August 23, 2020),
https://www.reginfo.gov/public/do/eoReviewSearch ..................................................................23

Federal Rule of Civil Procedure Rule 12 ........................................................................ 8, 9, 16

*Identification Cards for Members of the Uniformed Services, Their Dependents,
   and Other Eligible Individuals,* OMB (Fall 2018),
      https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=
      0790-AJ37..............................................................................................................................23

*List of Regulatory Actions Currently Under Review,*
      OMB, https://www.reginfo.gov/public/jsp/EO/eoDashboard.myjsp (last
      visited Aug. 23, 2020) ..........................................................................................................23

Press Release, Sen. Dianne Feinstein, Members of Congress to President Trump:
      Remove Policies Discriminating Against LGBTQ Individuals (July 9, 2020)
      (available at https://www.feinstein.senate.gov/public/index.cfm/press-
      releases?ContentRecord_id=999B8607-8D63-4DB6-98C1-721D38BEAE1A)...................24

## INTRODUCTION

The Court should deny Defendants' motion for dismissal or, in the alternative, for a stay of this action. Plaintiffs' allegations that their activities have been perceptibly impaired by Defendants' decision to not enforce a universal nondiscrimination requirement for Department of Health and Human Services ("HHS") grant programs—with a consequent drain on resources— are sufficient to plead standing. And Plaintiffs, which are mission driven to prevent discrimination in those very grant programs, easily fall within the relevant zone of interests. Nor do Defendants meet their burden to demonstrate a need for their requested stay.

This case concerns a federal regulation that ensured that critically important grant programs, funded by HHS, are administered free of discrimination. Representing more than $500 billion in grants, these programs provide essential health and wellness services to some of the most vulnerable members of our society, such as LGBTQ children in foster care, youth experiencing homelessness, and LGBTQ older people. Denying services to these populations can have devastating consequences for their physical and mental well-being. Nevertheless, through a Notice of Nonenforcement ("Notice"), Defendants abandoned a prohibition on grant recipients from discriminating against program beneficiaries based on age, disability, sex, race, color, national origin, religion, sexual orientation, and gender identity. This Notice is an unlawful final rule, issued without the opportunity for public comment and based on legally incorrect analysis and unreasoned decisionmaking in violation of the Administrative Procedure Act ("APA").

Defendants argue that Plaintiffs lack standing. Plaintiffs, however, provided detailed and specific allegations showing, among other things, that the Notice causes substantial confusion as to the nondiscrimination requirements, impairing Plaintiffs' work to ensure that program participants and grant recipients understand their legal rights and obligations, and compelling Plaintiffs to expend significant resources on responsive education and outreach campaigns.

1

These allegations are entirely consistent with the type of facts the Second Circuit recently confirmed establish standing. *New York v. Dep't of Homeland Sec.*, -- F.3d. --, No. 19-3591, 2020 WL 4457951, *11 (2d Cir. Aug. 4, 2020) [hereinafter *New York v. DHS*]. Defendants' primary argument to the contrary—that Plaintiffs are not injured because they have diverted resources to their usual activities—has been squarely considered and rejected by several courts in this Circuit. *See, e.g.*, *De Dandrade v. U.S. Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 182 (S.D.N.Y. 2019).

Defendants also argue that the zone-of-interests test requires dismissal. But Plaintiffs easily meet this "lenient" standard. *Fed. Defs. of New York, Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118, 128 (2d Cir. 2020). Plaintiffs' core work includes preventing the type of discrimination that the grants regulation prohibited and making the statutory grant programs at issue accessible to all.

Finally, Defendants ask to stay the litigation pending the potential promulgation of a new "grants rule" that would amend the nondiscrimination regulations. But Defendants do not meet their burden to establish the need for this "extraordinary" remedy. *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Transworld Mech., Inc*., 886 F. Supp. 1134, 1139 (S.D.N.Y. 1995). Plaintiffs are harmed every day the unlawful Notice remains in place, and Defendants have not shown a meaningful burden in proceeding with the litigation to outweigh that prejudice. Indeed, Defendants have not shown that the new rule will issue by any set date.

The Court should deny Defendants' Motion and resolve Plaintiffs' claims on their merits.

## BACKGROUND

## I.    Legal Background

In 2016, HHS promulgated a final rule that modified its grantmaking regulations to,

among other things, prohibit grant recipients from discriminating when providing services and

ensure that grant recipients treat same-sex spouses the same as different-sex spouses, consistent

with the Supreme Court decisions in *U.S. v. Windsor*, 570 U.S. 744 (2013) and *Obergefell v.

Hodges*, 576 U.S. 644 (2015). *See* Health and Human Services Grants Regulation, 81 Fed. Reg.

89393, 89395 (Dec. 12, 2016) [hereinafter "2016 Grants Rule"]. Accordingly, HHS's

grantmaking regulations now include the following subsections at 45 C.F.R. § 75.300:

> (c) It is a public policy requirement of HHS that no person otherwise eligible
> will be excluded from participation in, denied the benefits of, or subjected
> to discrimination in the administration of HHS programs and services based
> on non-merit factors such as age, disability, sex, race, color, national origin,
> religion, gender identity, or sexual orientation. Recipients must comply with
> this public policy requirement in the administration of programs supported
> by HHS awards.

> (d) In accordance with the Supreme Court decisions in *United States v.
> Windsor* and in *Obergefell v. Hodges*, all recipients must treat as valid the
> marriages of same-sex couples. This does not apply to registered domestic
> partnerships, civil unions or similar formal relationships recognized under
> state law as something other than a marriage.

As a result of the 2016 Grants Rule, HHS grant recipients were subject to a uniform set of

nondiscrimination requirements and were unambiguously required to treat as valid the marriages

of same-sex couples. This standardization provided substantial clarity regarding the grant

recipients' legal obligations, which—prior to the 2016 Grants Rule—were limited to a

patchwork of statutory and regulatory nondiscrimination requirements that provided protections

as to some, but not all, of the non-merit factors protected by the 2016 Grants Rule. In particular,

sex and religion are not universally protected by the various grant statutes, and LGBTQ status

typically does not receive explicit protections.

This clarity was short-lived, however, as Defendants announced a pair of actions on

November 1, 2019 that limit the non-discrimination protections that HHS will enforce. The first

of these was a Notice of Proposed Rulemaking that will, if finalized, permanently weaken the

non-discrimination provisions found at 45 C.F.R. § 75.300. Specifically, the proposed rule would prohibit discrimination only "to the extent doing so is prohibited by federal statute." *See* Health and Human Services Grants Regulation, 84 Fed. Reg. 63831, 63832 (Nov. 19, 2019).

Simultaneously, Defendants issued a Notice of Nonenforcement informing the public that, pending HHS's decision on the proposed rulemaking, HHS would no longer enforce the still-valid nondiscrimination requirements created by the 2016 Grants Rule. Notification of Nonenforcement of Health and Human Services Grants Regulation, 84 Fed. Reg. 63809 (Nov. 19, 2019) [hereinafter "Notice of Nonenforcement"]. By explicitly providing that the 2016 Grants Rule will not be enforced "with respect to any grantees," *id.* at 63811, the Notice substantively altered the legal obligations that will be enforced against grant recipients, sending a clear message to children, individuals, families, and the grant recipients themselves that HHS will not protect program participants from discrimination. The agency explained only that it had "significant concerns" about whether the 2016 Grants Rule complied with the Regulatory Flexibility Act, which requires agencies to analyze the impacts of regulations on small entities. *Id.* at 63809.

## II.    Grant Programs Impacted by the Notice of Nonenforcement

Defendants seek to provide recipients of federal funds with a license to discriminate in their provision of government-funded services to millions of people. Among those most likely to be impacted by the Notice are LGBTQ children and youth who are in the child welfare system and/or who are experiencing homelessness—settings in which such youth are dependent on HHS grantees for care and services. In both contexts, LGBTQ children and youth are overrepresented and particularly vulnerable to discrimination and its resulting harms. Compl. ¶¶ 59-62.

This overrepresentation is caused in part by a pattern of discrimination that begins with verbal and physical harassment by family members. *Id.* ¶ 60. LGBTQ youth may then leave

home (or be pushed out by rejecting parents), entering the child welfare system or becoming homeless. *Id*. In the child welfare system they may face even further discrimination, such as victimization and abuse by social work professionals, foster parents, and peers, again increasing the likelihood of becoming homeless. *Id.* ¶¶ 60, 62. Once homeless, they continue to experience discrimination and other systemic barriers to care, completing a cycle that results in a variety of poor mental and physical outcomes. *Id.* ¶¶ 62, 65. These harms are compounded when foster care and adoption agencies refuse to license LGBTQ prospective parents and guardians. *Id.* ¶ 61. Such discrimination harms LGBTQ youth by signaling that LGBTQ people are less deserving of dignity and equal protection under the law and by limiting the pool of potential homes for children who desperately need them. *Id.*

The Notice of Nonenforcement further endangers these already-vulnerable children by inviting the very service providers who care for such children to discriminate, especially on the basis of sexual orientation and gender identity. In the child welfare and foster care systems, HHS grant recipients include child welfare agencies that receive grant money under the Social Security Act Title IV-E program to provide foster care, adoption assistance, and kinship guardian assistance. *Id.* ¶ 64. In the homelessness setting, grant recipients receive funds under the Runaway and Homeless Youth Act to provide emergency shelter, crisis intervention, food, clothing, and medical care, as well as longer-term interventions intended to enable youth to transition into independent living. *Id.* ¶ 65. In both settings, providers have discriminated against LGBTQ youth, including through various forms of abuse and by refusing to provide services. *Id.* ¶¶ 64-65. The Notice permits these grant recipients to continue such discrimination without repercussion from the federal government. *Id.* ¶¶ 64-65.

The Notice of Nonenforcement also endangers LGBTQ older people who rely on critical services funded by HHS under the Older Americans Act. *Id.* ¶ 74. As with LGBTQ youth, LGBTQ older people are highly vulnerable as a result of the cumulative effects of discrimination. *Id.* ¶ 73. Many LGBTQ older people, for example, live with serious economic insecurity after a lifetime of housing and employment discrimination. *Id.* These vulnerabilities leave LGBTQ older people particularly reliant on HHS-funded services that enable older people to age with dignity and respect, including home and community-based services offered under the Older Americans Act, such as home-delivered meals (*i.e.*, Meals on Wheels). *Id.* ¶ 74. By issuing the Notice of Nonenforcement, Defendants have jeopardized these already-vulnerable older people by inviting service providers, many of whom are faith-based, to discriminate. *Id.* ¶ 75.

## III.     Plaintiffs' Harms From the Notice of Nonenforcement

As organizations that provide services to and advocate on behalf of the LGBTQ community, Plaintiffs have been harmed by Defendants' Notice, which has impaired Plaintiffs' activities and made their work more difficult and costly.

To advance equality for LGBTQ families, Plaintiff Family Equality engages in several activities to ensure that adoption and foster care services are free from discrimination—against both LGBTQ youth and LGBTQ adults seeking to foster or adopt—and to increase the availability of loving and stable homes for children in the child welfare system. *Id.* ¶ 10. These activities include outreach and education to LGBTQ families and support groups to ensure that they understand their rights and can advocate for themselves, as well as work on the federal and state levels to ensure that adoption and foster care services are free from discrimination. *Id.*

Plaintiff True Colors United accomplishes its mission by working to end youth homelessness and to ensure that homelessness services are safe for LGBTQ youth. *Id.* ¶ 12. To do so, True Colors United engages in several activities, including: free training, education, and

technical assistance programs to homelessness service providers to ensure that such services are safe and supportive for LGTBQ youth; work at the federal and state levels to promote funding, policies, systems, and protections that meet the needs of LGBTQ youth experiencing homelessness; and leadership development for such youth to empower them to create solutions to homelessness and other problems. *Id.* ¶ 13.

Similarly, Plaintiff Services & Advocacy for GLBT Elders ("SAGE") advances its mission to allow LGBTQ older people to age with dignity and respect through a variety of activities, including: operating a technical assistance resource center aimed at improving the quality of services and supports offered to LGBTQ older people; providing training to service providers in how to work in a non-discriminatory and effective manner with LGBTQ older people; providing direct services to LGBTQ older people in New York City; and working at the federal and state levels to ensure that policies, systems, and protections are in place to meet the needs of LGBTQ older people. *Id.* ¶ 15-16.

As discussed below, the Notice has impaired these activities by making it more difficult to educate service providers on their legal obligations, train providers on offering services in a non-discriminatory manner; instruct program beneficiaries on their legal rights; and ensure that services are safe for LGTBQ program participants. As a direct result, Plaintiffs must divert resources to combat these harms, including comprehensive education and outreach campaigns, as well as extensive work at the state level to replace the federal standards.

Seeking redress for these injuries, Plaintiffs filed suit on March 19, 2020 on the ground that the Notice violates the APA. First, the Notice is procedurally invalid as it was promulgated without an opportunity for public comment. Second, the Notice is arbitrary and capricious because Defendants' only explanation is a legally incorrect determination that the 2016 Grants

Rule violated the Regulatory Flexibility Act. Third, the Notice is also arbitrary and capricious because, while Defendants considered *potential* harms to small businesses from the 2016 Grants Rule, they entirely failed to consider the harms that would occur to program beneficiaries as a result of their decision to abandon the 2016 Grants Rule's nondiscrimination protections.

**STANDARD OF REVIEW**

## I.      Federal Rule of Civil Procedure 12(b)(1)

On a motion to dismiss under Rule 12(b)(1), courts must "accept the complaint's material allegations as true, and . . . draw all reasonable inferences in the plaintiffs' favor." *Raymond Loubier Irrevocable Trust v. Loubier*, 858 F.3d 719, 725 (2d Cir. 2017) (citation omitted); *see also, e.g.*, *John v. Whole Foods Mkt. Grp., Inc.*, 858 F.3d 732, 737 (2d Cir. 2017). While the party invoking jurisdiction bears the burden of establishing jurisdiction, this showing should be evaluated "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Therefore, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [courts] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)); *accord, e.g., John*, 858 F.3d at 737.

When standing is challenged at the motion to dismiss stage, "'the burden imposed' on plaintiffs . . . 'is not onerous.'" *Peacock v. Dist. of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011)); *accord, e.g., Melrose Credit Union v. City of New York*, 247 F. Supp. 3d 356, 365 (S.D.N.Y. 2017). Courts "must be careful not to decide the questions on the merits for or against the

plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *City of Waukesha v. EPA*, 320 F.3d 228, 235 (D.C. Cir. 2003). Where, as here, defendants' challenge to standing is "based solely on the allegations of the complaint . . ., the plaintiff has no evidentiary burden," *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 56 (2d Cir. 2016), and the court must "accept as true all material allegations of the complaint, and . . . construe the complaint in favor of the complaining party," *United States v. Vazquez*, 145 F.3d 74, 81 (2d Cir. 1998) (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)).

## II.     Federal Rule of Civil Procedure 12(b)(6)[1]

On a motion to dismiss for failure to state a claim, courts must accept as true all well-pleaded factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully," but it is not a "probability requirement." *Id.*

## ARGUMENT

## I.     Plaintiffs Have Standing.

An organization may sue "on its own behalf so long as it can independently satisfy the requirements of Article III standing[.]" *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011). Just as for any other litigant, the organization must allege that it "suffered an injury-in-fact that is distinct and palpable; the injury must be fairly traceable to the challenged action; and the injury

---

[1] As explained further below, *infra* 15 n.6, Defendants' zone-of-interests challenge should have been brought under Rule 12(b)(6) rather than Rule 12(b)(1).

9

must be likely redressable by a favorable decision." *Id.*[2] "[O]nly a perceptible impairment of an organization's activities is necessary for there to be an injury-in-fact." *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017). "[W]here an organization diverts its resources away from its current activities, it has suffered an injury that [is] independently sufficient to confer organizational standing." *Id.* at 111 (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (a "concrete and demonstrable injury to [an] organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests")). And where "multiple parties seek the same relief, the presence of one party with standing is sufficient to satisfy Article III's case-or controversy requirement." *Id.* at 109 (internal quotation omitted). Plaintiffs' allegations easily clear this bar.

*First*, the Notice impairs Plaintiffs' efforts to train grant recipients on their legal obligations, Compl. ¶¶ 13, 83, 86, and to educate program participants on their rights, *id.* ¶ 10, by creating substantial confusion around those legal obligations and rights. *Id.* ¶ 78 (the Notice subjects grant recipients "to a patchwork of . . . statutory and regulatory protections"). To combat this confusion, Plaintiffs have already diverted resources to hundreds of hours of work on education and outreach campaigns to ensure that program participants "understand the full impact of HHS's nonenforcement action" and that grant recipients "understand their existing obligations not to discriminate[.]" *Id.* ¶¶ 79, 87, 92. Under Second Circuit precedent, these allegations are sufficient to plead Article III standing. *See New York v. DHS,* 2020 WL 4457951 at *11 (holding that the organization had standing where the "complexities of the [challenged] Rule required [the organization] to change its educational outreach from group sessions to time-

---

[2] Only the injury-in-fact element of standing is at issue in Defendants' motion.

intensive individual meetings"); *see also Common Cause / New York v. Brehm*, 432 F. Supp. 3d
285, 309 (S.D.N.Y. 2020) (collecting cases where organizations had standing based on a
diversion of resources towards educating voters about new voting laws).

Defendants are incorrect in asserting that this injury is insufficient because Plaintiffs
engaged in similar activities prior to the Notice. Mem. Of Law in Support of Defs.' Mot. to
Dismiss, ECF No. 41, 9-10 [hereinafter "HHS Br."]. "It is of no consequence that part of the
diversion of resources is to . . . activities that are already part of the organization's usual
services," as organizations have standing where "the defendant's conduct or policy interferes
with or burdens an organization's ability to carry out its usual activities." *De Dandrade*, 367 F.
Supp. 3d at 182. *See also New York v. DHS*, 2020 WL 4457951 at *10-11 (rejecting argument
that "[o]rganizations [had] merely altered the subject matter of their existing outreach work");
*Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y 2012)
(rejecting argument that plaintiffs "lack standing because the outreach and services they provide
are precisely the type of services that they routinely provide as part of their respective
organizational missions" (internal quotation omitted)).

Contrary to Defendants' argument, *Centro de la Comunidad Hispana v. Town of Oyster
Bay* does not stand for the proposition that "the challenged conduct must make the plaintiff do
something new and different[.]" HHS Br. 10. Rather, that case stands for precisely the opposite
proposition—there, an organization that had to devote *more* resources to an ongoing project as a
result of the challenged action had established a cognizable injury. *Centro*, 868 F.3d at 110
(existing efforts to organize day laborers were made "more costly" by a city ordinance that
dispersed the laborers, forcing the organization to "divert money from its *other* current activities
to advance its established organizational interests" (emphasis added)).

Just so here. The Notice eliminated universal and clear nondiscrimination protections, leaving only a patchwork of nondiscrimination protections provided by the underlying statutes and creating "substantial confusion regarding the legal obligations of grant recipients and the right of the populations they serve to be free from discrimination." Compl. ¶ 78. Plaintiffs have had to respond, consistent with their missions to ensure that LGBTQ program beneficiaries understand their rights and that grant recipients understand their obligations, with new and expanded education campaigns. Compl. ¶¶ 79, 87, 92. That Plaintiffs previously engaged in educational outreach has no bearing on the conclusion that their activities have been perceptibly impaired, requiring them to divert resources from "other current activities" in response. *Centro*, 868 F.3d at 110. Family Equality's education and outreach campaign on the Notice, for example, diverted substantial resources away from "its work to promote the Every Child Deserves a Family Act . . . as well as its work on a variety of other policy issues . . . , such as paid leave, healthcare, and housing." Compl. ¶ 80; *see also* ¶¶ 89, 93 (detailing the activities from which other Plaintiffs have diverted resources).

Plaintiffs' injuries are also on all fours with those discussed in *Havens Realty*, the seminal case on organizational injury. Plaintiffs' efforts to educate grant recipients and beneficiaries (as well as their other mission driven activities, described below) have been "perceptibly impaired" by the confusion created by the Notice. 455 U.S. at 379. Contrary to Defendants' argument, HHS Br. 10, *Havens Realty* imposed no requirement that an organization's response to such impairment be some unique activity or program not previously offered. *Id.* at 378-79. Similarly, in *Olsen v. Stark Homes, Inc.*, a fair housing advocacy and counseling organization had standing based on its investigation and advocacy in a particular case of housing discrimination. 759 F.3d 140 (2d Cir. 2014). The Second Circuit imposed no

requirement that the investigation and advocacy in that case be a new activity for the

organization. *Id*. at 158. Rather, the essential allegation in both *Havens Realty* and *Olsen*, just as

Plaintiffs have alleged here, was that the defendants' challenged activities required the plaintiffs

to spend *additional resources* on one particular type of work (even if they engaged in similar

work previously), to the detriment of their other organizational activities.[3]

     **Second**, the Notice impairs Plaintiff True Colors United's educational services by

eliminating its ability to teach service providers the importance of not discriminating against

homeless LGBTQ youth by relying on the 2016 Grants Rule as a training tool. Compl. ¶ 83. This

renders the educational services "less effective," forcing the organization to divert hundreds of

hours of staff time to "replac[ing] the defunct federal standards." *Id.* ¶¶ 83-84.

     Defendants object that these harms are not an "impediment to [Plaintiffs'] activities," and

instead reflect Plaintiffs' "interest in a problem[.]" HHS Br. 11. There is no basis for this

argument given True Colors United's specific and particular allegations of injury. That True

Colors United's diversion of resources toward an attempt to compensate for the lost ability to

rely on the 2016 Grants Rule is also consistent with its mission does not make the costs to the

organization any less cognizable. *Nnebe*, 644 F.3d at 157 ("so long as the economic effect on an

organization is real, the organization does not lose standing simply because the proximate cause

of that economic injury is the organization's noneconomic interest in encouraging [a particular

---

[3] The other two cases cited by Defendants are also inapposite. *See* HHS Br. 10. In *Center for
Food Safety v. Price*, the plaintiffs failed to allege that they were "compelled to expend resources
to counteract or remedy some harm imposed by Defendants' conduct." No. 17-3833, 2018 WL
4356730, *5 (S.D.N.Y. Sept. 12, 2018). So too in *Citizens for Responsibility & Ethics in
Washington v. Trump*, 276 F. Supp. 3d 174, 190-92 (S.D.N.Y. 2017) (*vacated and remanded on
other grounds*, 953 F.3d 178 (2d Cir. 2019)). Here, by contrast, Plaintiffs have alleged that the
Notice impairs Plaintiff's training activities by introducing substantial confusion, thereby
"compel[ing]" Plaintiffs to "expend resources to counteract" the harm. *Supra* 10-12.

policy preference]" (internal quotation omitted)). Unlike the one, out-of-circuit decision relied on by Defendants for this argument, Plaintiffs' allegations are not limited to injury in their lobbying strategies. HHS Br. 11 (citing *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, n.4 (D.C. Cir. 2005)). Instead, just like the organizations found to have standing in the Second Circuit's recent decision in *New York v. Department of Homeland Security*, Plaintiffs' concrete and detailed allegations regarding their impaired educational activities and subsequent diversion of resources show more than an "abstract social interest[]." 2020 WL 4457951 at *11.[4]

*Third*, the Notice impairs Plaintiffs True Colors United's and SAGE's efforts to ensure that services are safe for LGBTQ program participants by "serv[ing] as an explicit invitation to discriminate." Compl. ¶ 83; *see* ¶ 91. To respond to the harms created in the absence of HHS's nondiscrimination protections, both True Colors United and SAGE have been forced to divert hundreds of hours to obtain, and educate state policymakers on the need for, state-level protections. *Id.*  ¶¶ 84-85, 91. And SAGE has found it necessary to engage in additional direct education of providers as to the importance of meeting the unique needs of LGBTQ older people, encouraging providers to do so even in the absence of regulatory protections. Compl. ¶ 93. Having been "compel[ed] to devote resources to combatting the effects of [a] law that [is] harmful to [their] mission[s]," True Colors United and SAGE have alleged an injury-in-fact. *Common Cause/New York*, 432 F. Supp. 3d at 308.

The Second Circuit has not followed the "narrower view of *Havens Realty*" posited in other circuits that require more than a "perceptible impairment" to an organization's activities. *Nnebe*, 644 F.3d at 157. Accordingly, the D.C. Circuit's decision in *Center for Law &*

---

[4] Defendants also assert that Plaintiffs failed to identify a subsequent diversion of resources. Not so. *See* Compl. ¶ 84 (True Colors has already diverted "approximately 135 hours" to "obtain[ing] state-level protections to replace the defunct federal standards.").

*Education*, 396 F.3d at 1158, 1161-62, does not preclude standing. Defendants identify no Second Circuit cases that denied standing in the face of concrete and detailed allegations about plaintiff organizations' diversion of resources to time-consuming and costly state-based advocacy to make up for the loss of federal protections. And in contrast to decisions where standing has been found to be lacking, these efforts by True Colors United and SAGE to "mitigate the Rule's impact on those they serve" have imposed a "perceptible opportunity cost" sufficient for standing. *New York v. DHS*, 2020 WL 4457951 at *10 (quoting *Nnebe*, 644 F.3d at 157). *See* Compl. ¶¶ 88-89, 91-93. *Cf. Common Cause/New York*, 432 F. Supp. 3d at 307-09 (organization had standing where it devoted resources in part to "public advocacy at hearings, . . . meetings with the New York State Board of Elections and legislative advocacy"). And, in any event, Defendants have no answer to SAGE's allegation that it must redouble its efforts to reach service providers directly and educate them on the importance of providing safe and inclusive services, undoubtedly a perceptible impairment of its activities, which has also diverted time and effort away from its other ongoing projects. Compl. ¶ 93. Thus, even if Defendants' view of the law were correct, Plaintiffs' allegations would still suffice to establish standing.[5]

## II.     Plaintiffs Fall Within the Applicable Zones of Interests.[6]

Defendants' attempt to dismiss this case as outside of the relevant zones of interests fails. Consistent with "Congress' evident intent when enacting the APA to make agency action

---

[5] Defendants also reprise their arguments that these harms are insufficient because "state level work was already a part of their core activities prior to the . . . Notice[.]" HHS Br. 12. But, as discussed above, Plaintiffs are not required to divert resources towards entirely new activities. *Supra* 11-12. Rather, they need only expend resources to "combat activity that harms [the] organization's core activities." *Centro*, 868 F.3d. at 111. Plaintiffs have clearly done so here.

[6] Contrary to Defendants' motion, the zone-of-interests test is not a jurisdictional requirement. The Supreme Court recently clarified that the test, which asks whether a plaintiff has a cause of action, is not jurisdictional "since the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction[.]" *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

presumptively reviewable," the test is not "especially demanding" in APA challenges. *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (internal quotations omitted). "In that context, [the Supreme Court has] often conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff[.]" *Lexmark Intern.*, 572 U.S. at 130. And the test may be satisfied even if there is "no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399-400 (1987). The test forecloses suit only when a "plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* at 399.

Plaintiffs' interests in this APA challenge to the unlawful Notice of Nonenforcement of nondiscrimination protections—which stem from their missions to protect and promote the rights of LGBTQ individuals to access needed services without fear of refusal, mistreatment, or harassment—are within the zone of interests of the unlawfully abandoned nondiscrimination regulation, as well as the statutory grant programs that provide those services. Plaintiffs thus easily satisfy this "lenient test." *Fed. Defs. of New York*, 954 F.3d at 128.

### A.    Plaintiffs are within the zone of interests of the 2016 Grants Rule.

As an initial matter, Defendants are incorrect that the relevant zone of interests relates to the statutes establishing the many HHS grant programs, such as Title IV-E of the Social Security

---

118, 128 n.4 (2014); *accord Fed. Defs. of New York, Inc.*, 954 F.3d, 128 (2d Cir. 2020) ("[T]he zone-of-interests test . . . is not of jurisdictional import."). Accordingly, "a motion to dismiss [for failure to fall within the zone of interests] is brought pursuant to Rule 12(b)(6), rather than Rule 12(b)(1)." *Maiden Creek Assocs. v. U.S. Dep't of Transp.*, 823 F.3d 184, 189 n.1 (3d Cir. 2016); *see also Friends of Capital Crescent Trail v. Fed. Transit Admin.*, No. 17-1811, 2019 WL 1046889, *3 n.3 (D.D.C. Mar. 5, 2019). The Court may decline to entertain the challenge because no motion to dismiss under Rule 12(b)(6) has been presented. If it does decide to review Defendants' arguments in this regard, it should do so under the standard of review applicable to Rule 12(b)(6) motions.

Act. HHS Br. 14. Rather, to determine "whether a . . . cause of action encompasses a particular plaintiff's claim," *Lexmark*, 572 U.S. at 127, the zone-of-interests test asks whether a plaintiff's interests in the litigation fall "arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question," *Clarke*, 479 U.S. at 396. Or, as applicable here, the relevant regulation. *Fed. Defs. of New York*, 954 F.3d at 131. Because Plaintiffs have challenged HHS's decision to not enforce the still-valid nondiscrimination regulation, the relevant interests are those protected by the regulation. *Id.* (agency regulations at issue in APA challenges provide the relevant zone of interests); *cf. NAACP v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018) (looking to the Immigration and Nationality Act for the relevant zone of interests in a challenge brought against the agency's enforcement policy regarding that statute).

Here, Plaintiffs fall squarely within the zone of interests protected by that regulation, which prohibits grant recipients from "discriminat[ing] based on non-merit factors such as . . . sex, . . . gender identity, or sexual orientation," 45 C.F.R. § 75.300(c), and ensures that grant recipients "treat as valid the marriages of same-sex couples," *id.* § 75.300(d). The interests of each of the three Plaintiffs in this litigation stem from their missions to ensure that LGBTQ families, youth, and elders are free from the very discrimination prohibited by the regulations. *See* Compl. ¶¶ 9, 77 (Family Equality); *id.* ¶¶ 12, 82 (True Colors); *id.* ¶¶ 15, 90 (SAGE). Plaintiffs are therefore "among those who in practice can be expected to police the interests that the [regulations] protect[]," namely the interests of program participants in being free from discrimination while receiving services through HHS-funded grant programs. *See New York v. DHS*, 2020 WL 4457951 at *12.

### B.    Plaintiffs are also within the zones of interests of the grants programs.

Even if the statutory grant programs provide the zones of interest, Plaintiffs meet this test.

17

Plaintiff Family Equality is squarely within the zone of interests of Title IV-E of the Social Security Act, which funds various child welfare services through HHS "for the purpose of enabling each State to provide . . . foster care . . ., adoption assistance for children with special needs, kinship guardian services, and prevention services and programs[.]" 42 U.S.C. § 670. Critically, Title IV-E requires states to comply with federal standards to improve outcomes for children in the foster care and adoption system. *See, e.g.*, 42 U.S.C. § 671 (imposing extensive and detailed requirements on states, such as ensuring that foster care parents are adequately prepared to meet the needs of a child). Entirely consistent with these purposes, Family Equality's interest in this litigation stems from its mission-driven work to ensure that "adoption and foster care services are safe for LGBTQ youth," Compl. ¶ 77, and to "promote the best interests of all children in the foster care and adoption system by increasing their access to loving, stable forever homes," *id.* ¶ 10; *see also id.* ¶¶ 60-61 (discrimination invited by Defendants' Notice harms children in the foster care system).

Similarly, True Colors United falls within the zone of interests of the Runaway and Homeless Youth Act, which funds various programs through HHS, *see id.* ¶ 65, to provide urgently needed services to runaway and homeless youth in recognition of the fact that such youth are "at risk of developing, and have a disproportionate share of, serious health, behavioral, and emotional problems[.]" 34 U.S.C. § 11201. True Colors United's interest in this lawsuit relates to its mission-driven work to "ensure that homelessness services are safe for LGBTQ youth," and thereby prevent the very health, behavioral, and emotional problems that the statute seeks to address. Compl. ¶ 82; *see also id.* ¶¶ 59, 61-65.

SAGE likewise falls within the zone of interests of the Older Americans Act, which funds multiple grant programs through HHS (*e.g.*, Meals on Wheels) and was enacted to "assist

our older people to secure equal opportunity to the full and free enjoyment of [various] objectives," including "adequate income in retirement," "[t]he best possible physical and mental health," "suitable housing," "[e]fficient community services," and "[r]etirement in health, honor, [and] dignity[.]" 42 U.S.C. § 3001. Consistent with these objectives, SAGE's interest in this litigation stems from its mission-driven work "to ensure that LGBTQ older people are able to age with dignity." Compl. ¶ 90; *see id.* ¶¶ 73-75 (explaining that HHS's Notice invites discrimination against already vulnerable LGBTQ older people).

Defendants distort the zone-of-interests test in several ways. To start, Defendants assert the statutory grant programs are intended to protect the rights and interests of individuals, rather than advocacy organizations. HHS Br. 14. But the zone-of-interests test does not require any "indication of congressional purpose to benefit the would-be plaintiff." *Clarke*, 479 U.S. at 399-400. The question is not whether the statutes benefit Plaintiffs, but instead whether the issues advanced by Plaintiffs arguably fall within the statutes' scope. *Match-E-Be-Nash-She-Wish*, 567 U.S. at 225 n.7. As to *that* question, Plaintiffs' interests in this litigation unequivocally align with the objectives and purposes of the statutory grant programs. *Supra* 18.[7] And in similar circumstances, courts have found that third-party service providers working to protect mission-driven interests affected by the law at issue satisfy the zone-of-interests test. *See, e.g.*, *New York v. DHS*, 2020 WL 4457951 at *11-12 (organizations' interest in "increas[ing] [the] well-being and status" of non-citizens was consistent with the Public Charge statute's purpose of admitting

---

[7] That Plaintiffs' Article III injuries rely on the organizational standing principles articulated in *Havens*, such as their allegations regarding their diversions of their resources, hardly reduces their interest in the case to "the efficient use of their resources." HHS Br. 14. Just as in *New York v. DHS*, their interests stem from their organizational missions related to LGBTQ protections in the receipt of social services. 2020 WL 4457951 at *11-12.

non-citizens to the country where doing so "advances goals of family unity and economic competitiveness"); *O.A. v. Trump*, 404 F. Supp. 3d 109, 144 (D.D.C. 2019).

Defendants next object that Plaintiffs are improperly asserting the statutory rights of third parties, which Defendants assert is "foreclose[d]" by the zone-of-interests test. HHS Br. 14. This argument conflates the zone-of-interests test with third-party standing doctrine, which generally prohibits plaintiffs from "rest[ing a] claim to relief on the legal rights or interests of third parties" with certain "limited . . . exception[s.]" *Kowalski v. Tesmer*, 543 U.S. 125, 129-30 (2004); *see also Ctr. for Reprod. Law & Policy v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002) (applying both tests to two different claims). The third-party standing doctrine is irrelevant here because plaintiffs bring this case on their own behalf, asserting "harm[s] to their own interests," unlike the plaintiffs in *Center for Reproductive Law & Policy*, 304 F.3d. at 196.[8]

## III.    A Stay is Not Warranted.

Staying a civil case is "an extraordinary remedy." *Trs. of the Plumbers & Pipefitters Nat'l Pension Fund*, 886 F. Supp. at 1139 (citing *In re Par Pharmaceutical, Inc.*, 133 F.R.D. 12, 13 (S.D.N.Y. 1990)). In considering a request for a stay, courts balance: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the

---

[8] In that case, reproductive rights organizations brought a due process challenge to a policy that prohibited foreign non-profits from performing or promoting abortions as a condition of receiving United States aid. *Ctr. For Reprod. Law & Policy*, 304 F.3d at 196. Because the due process claim alleged that the policy failed to give clear notice to the *foreign* non-profits of the prohibited activities, the Second Circuit held that the injury was to the foreign non-profits' interest in due process, rather than the interests of plaintiffs in that case. *Id.* In contrast, Plaintiffs in this case have alleged that Defendants' Notice has harmed their own mission-driven activities. *Supra* 10-14.

public interest." *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 621 (S.D.N.Y. 2012); *see also Kappel v. Comfort*, 914 F. Supp. 1056, 1058 (S.D.N.Y. 1996). In balancing these factors, courts act "with the central focus of avoiding prejudice." *Consol. Edison Co. of N.Y. v. United States*, 30 F. Supp. 2d 385, 389 (S.D.N.Y. 1998). The party seeking the stay "bears the burden of establishing its need." *Louis Vuitton Malletier S.A. v. LY USA, Inc.*, 676 F.3d 83, 97 (2d Cir. 2012) (quoting *Clinton v. Jones*, 520 U.S. 681, 706–08 (1997)). Here, each of these factors counsels against the stay, and Defendants have not met their burden to establish its need.

First, plaintiffs have a significant interest in proceeding with the litigation to seek redress for their ongoing injuries, and, conversely, would be prejudiced by any stay. "Courts are generally reluctant to stay proceedings because they are concerned with vindicating the *plaintiff's* right to proceed with its case." *LaSala v. Needham & Co.*, 399 F. Supp. 2d 421, 428 (S.D.N.Y. 2005) (citing *An Giang Agric. & Food Imp. Exp. Co. v. U.S.*, 350 F. Supp. 2d 1162, 1164 n. 3 (Ct. Int'l Trade 2004)); *Exp.-Imp. Bank of U.S. v. Hi-Films S.A. de C.V.*, No. 09-3573, 2010 WL 3743826, at *12 (S.D.N.Y. Sept. 24, 2010) ("courts generally give weight to a plaintiff's strong interest in proceeding with its litigation"). The prejudice from the requested stay is especially evident given the peculiarities of this particular rulemaking. As Plaintiffs allege, the Notice of Nonenforcement is a final rule that substantively changes the existing grants regulation, although Defendants ignored the APA's procedural requirements. Compl. ¶¶ 94-102. Yet Defendants' primary argument in favor of a stay is their anticipated promulgation of a new final rule. By pairing an unacknowledged final rule, in the form of the Notice of Nonenforcement, with a notice of proposed rulemaking that proposes to achieve essentially the same result as the existing Notice, and then asserting that the first should not be challenged during the pendency of the second, Defendants would effectively deprive Plaintiffs of any ability

to vindicate their rights vis-a-vis the Notice, no matter how long it remained in place. Finding Defendants to be entitled to a stay of litigation in such circumstances would create a disincentive ever to issue a reviewable final rule.

Defendants ignore Plaintiffs' ongoing injuries on the ground that a new grants rule may soon moot Plaintiffs' challenge. This speculation does not meet Defendants' burden in demonstrating a need for a stay. While HHS may ultimately issue a final rule, it has not done so yet. It may never issue the rule or may do so only after significant delay or modification. Tellingly, Defendants do not promise to promulgate the rule by a specific date. *Cf. New York v. U.S. Army Corps of Eng'rs*, 896 F. Supp. 2d 180, 194 (E.D.N.Y. 2012) ("[t]he line between proposed regulations and final regulations may be subtle, but the court believes it is real"); *Am. Acad. of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 470 (D. Md. 2019) (declining to delay ruling where "Defendants do not state, even generally, when the draft guidance will be finalized").

Defendants note that the proposed rule is currently being reviewed by the Office of Management and Budget ("OMB"). While this step is near the end of the rulemaking process, it hardly guarantees imminent promulgation of a final rule that would render Plaintiffs' claims moot. Instead, OMB may return the rule to HHS for further consideration or modification. *See* Exec. Order No. 12866 Sec. 6(b)(3), 58 Fed. Reg. 51,735 (Sept. 30, 1993). OMB review may also significantly exceed the ninety-day benchmark. While Exec. Order 12866 sets a presumptive period of ninety days for OMB to complete its review, *id*. Sec. 6(b)(2), OMB may take one 30-day extension and agency heads may request unlimited extensions. Exec. Order 12866 Sec 6(b)(2)(C). Nor is this deadline binding or enforceable. Rules have been pending at OMB since

2018, far exceeding the presumptive ninety days.[9] HHS alone has seven OMB submissions that have been pending for more than ninety days, including several from 2019.[10] In total, 38 of the 123 actions pending at OMB have been pending for more than 90 days.[11]

Further, OMB and HHS may be reconsidering—and should reconsider—the proposed grant rule's promulgation following the Supreme Court's recent decision in *Bostock v. Clayton County, Georgia*, No. 17-1618, 2020 WL 3146686 (U.S. June 15, 2020), making imminent mootness substantially less likely. Notably, although Plaintiffs raised this concern in their earlier letter to the Court, ECF No. 31 at 3, Defendants did not address it in their request for a stay.

*Bostock* definitively ruled that the prohibition of discrimination on the basis of sex in employment in Title VII of the Civil Rights Act necessarily includes discrimination against LGBTQ people. As relevant here, HHS's proposed grants rule would eliminate the existing prohibition on discrimination on the basis of "age, disability, sex, race, color, national origin, religion, gender identity, or sexual orientation" 45 C.F.R. § 75.300(c), and replace it with a prohibition on discrimination by grantees "to the extent doing so is prohibited by statute." 84 Fed. Reg. 63,831-01, 63,832 (Nov. 19, 2019). Many statutes administered by HHS already prohibit discrimination on the basis of sex, but do not specifically include sexual orientation and gender identity or transgender status.[12] Given the resulting possibility for confusion and illegal

---

[9] *Identification Cards for Members of the Uniformed Services, Their Dependents, and Other Eligible Individuals,* OMB (Fall 2018),
https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=201810&RIN=0790-AJ37.

[10] *Office of Information and Regulatory Affairs (OIRA), Executive Order Submissions Under Review,* OMB (August 23, 2020), https://www.reginfo.gov/public/do/eoReviewSearch.

[11] *List of Regulatory Actions Currently Under Review,* OMB,
https://www.reginfo.gov/public/jsp/EO/eoDashboard.myjsp (last visited Aug. 23, 2020).

[12] *Discrimination on the Basis of Sex*, HHS (last reviewed Oct. 20, 2019),
https://www.hhs.gov/civil-rights/for-individuals/sex-discrimination/index.html.

discrimination, HHS will need to revisit the proposed rule to address *Bostock*—namely to clarify that, for each of the statutes it administers, prohibited sex discrimination includes discrimination against LGBTQ people.[13] Or, if HHS decides against this legally correct application of *Bostock*, it will also need to, at a minimum, provide an explanation as to the purported basis for distinction. HHS must also consider leaving in place the 2016 Rule, the broad protections in which are consistent with *Bostock*'s analysis of discrimination. Appropriate reconsideration of the proposed rule will take time, making any stay even more prejudicial to Plaintiffs.[14]

Consideration of the first factor alone, therefore, compels denial of the stay. The other factors further support this conclusion. On the second factor, Defendants have identified no meaningful interests in staying the litigation or burden of proceeding aside from the routine obligations of civil litigation. This minimal burden is substantially lessened as this is a record review case. This is hardly the showing of a "clear case of hardship or inequity" required given the "fair possibility that the stay . . . will work damage" to plaintiffs. *Landis v. N. Am. Co*., 299 U.S. 248, 255 (1936); *see also Hicks v. City of New York,* 268 F. Supp. 2d 238, 241 (E.D.N.Y. 2003) ("[A]bsent a showing of undue prejudice upon defendant . . ., there is no reason why

---

[13] Indeed, members of Congress have called on the Administration to align all federal regulations with *Bostock*. *See* Press Release, Sen. Dianne Feinstein, Members of Congress to President Trump: Remove Policies Discriminating Against LGBTQ Individuals (July 9, 2020) (available at https://www.feinstein.senate.gov/public/index.cfm/press-releases?ContentRecord_id=999B8607-8D63-4DB6-98C1-721D38BEAE1A). Whether the Administration decides to do so or not, there can be no question that *Bostock* significantly complicates finalization of the proposed rule.

[14] Even if the rule is finalized, it may be subject to legal challenge and subsequently vacated—a prospect that will only be made more likely if Defendants fail to align the final rule with *Bostock*. Defendants' filing suggests, but does not confirm, that if a final rule is promulgated and successfully vacated, that the Notice of Nonenforcement will no longer be in place—*e.g.*, HHS will not republish such a Notice during any remand period for the vacated final rule. But nothing in the Notice of Nonenforcement or any other formal agency statement confirms that vacatur of a final grants rule would result in anything other than a return to the current status quo, with a nonenforcement policy in place and the ongoing injuries it causes.

plaintiff should be delayed in its efforts . . . to sustain its claim."). Defendants also assert without explanation that proceeding with the litigation could disrupt the administration of HHS grants programs. It is not at all clear what disruption could occur. If Plaintiffs are successful in vacating the Notice, any resulting "disruption" would be caused by elimination of an unlawful rule, hardly the type that could be considered prejudicial.

As to the third factor, the Court "has an interest in advancing its docket" through the orderly procession of litigation. *Citibank, N.A. v. Super Sayin' Publ'g, LLC*, 86 F. Supp. 3d 244, 248 (S.D.N.Y. 2015). *See also Hicks*, 268 F. Supp. 2d at 243 (E.D.N.Y. 2003) ("a court's interest is usually best served by discouraging motions to stay"). Defendants point to no case where avoiding judicial review of a matter that could become moot was a sufficient basis to stay litigation, nor is it likely that they could given the strong interest in "uphold[ing] plaintiff's right to . . . prosecute his claims in the manner of his choice." *McDonald v. Piedmont Aviation,* 625 F. Supp. 762, 767 (S.D.N.Y. 1986).

The fourth and fifth factors—the interests of third parties and the public—further support denying the stay. Defendants rehash the concern about the burden of litigation, which is minimal here; and, in any event, of little concern to the public writ large. And, again, they do not explain how the instant litigation could disrupt the grants regulation in a way that would have any impact on the public, other than by—should Plaintiffs prove successful—eliminating an unlawful rule, an outcome that could only be beneficial, especially given its reinstatement of protections for vulnerable populations in need of services.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion for dismissal or, in the alternative, for a stay of this action.

August 24, 2020                                    Respectfully submitted,


                                                   */s/  Kristen Miller*_____

                                                   Kristen Miller (D.C. Bar No. 220627)*
                                                   Robin Thurston (D.C. Bar No. 1531399)*
                                                   Sean Lev (D.C. Bar No. 449936)*
                                                   Jeffrey B. Dubner (NY Bar No. 4974341)
                                                   Democracy Forward Foundation
                                                   1333 H St. N.W.
                                                   Washington, DC 20005
                                                   (202) 601-2483
                                                   kmiller@democrcayforward.org
                                                   rthurston@democracyforward.org
                                                   slev@democracyforward.org
                                                   jdubner@democracyforward.org

                                                   M. Currey Cook (NY Bar No. 4612834)**
                                                   Lambda Legal
                                                   120 Wall St., 19th Fl.
                                                   New York, New York 10005
                                                   (212) 809-8585
                                                   ccook@lambdalegal.org

                                                   Sasha Buchert (OR Bar No. 070686)**
                                                   Lambda Legal
                                                   1776 K Street N.W., 8th Floor
                                                   Washington, DC 20006-2304
                                                   (202) 804-6245
                                                   sbuchert@lambdalegal.org

                                                   *admitted *pro hac vice*
                                                   ***pro hac vice* application forthcoming


                                                   *Counsel for Plaintiffs*


26