UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

FAMILY EQUALITY; TRUE COLORS
UNITED, INC.; and SERVICES &
ADVOCACY FOR GLBT ELDERS,

               Plaintiffs,

           v.                                             20 Civ. 2403 (MKV)

ALEX M. AZAR II, in his official capacity
as Secretary, United States Department of
Health and Human Services; and THE UNITED
STATES DEPARTMENT OF
HEALTH AND HUMAN SERVICES,

               Defendants.

---

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF
DEFENDANTS' MOTION TO DISMISS**

AUDREY STRAUSS
Acting United States Attorney for the
Southern District of New York
86 Chambers Street, Third Floor
New York, New York 10007

JENNIFER C. SIMON
Assistant United States Attorney
     *Of Counsel*

Defendants, by their attorney Audrey Strauss, Acting United States Attorney for the

Southern District of New York, respectfully submit this reply memorandum of law in further

support of their motion to dismiss the Complaint or, in the alternative, to stay this suit pending final

promulgation of the anticipated amended grants regulation.

### PRELIMINARY STATEMENT

As set forth in Defendants' opening memorandum of law, Plaintiffs lack constitutional

standing in this Administrative Procedure Act ("APA") action because they fail to demonstrate an

injury in fact; they have not demonstrated that HHS's decision not to enforce the regulations in

question impedes their activities or has caused them to divert resources to other activities in which

they would not otherwise be engaged.[1]  Instead, Plaintiffs have alleged only a disagreement with a

policy they view as adverse to their advocacy interests, which is not enough to confer standing to

bring this claim.  Moreover, Plaintiffs do not meet the standard for statutory standing because they

do not adequately allege that their interests fall within the relevant "zone of interests"; Plaintiffs

have not shown that any of the statutes they invoke were intended to protect the advocacy activities

of organizations.  If this Court is not prepared to dismiss the action, Defendants respectfully request

a stay in light of the anticipated promulgation of the final rule.  Although HHS cannot give a

definitive estimate on when the rule will be issued, a stay is within this Court's discretion to

conserve resources, particularly as the promulgation of the final rule is expected to render the

challenged notice in this case moot.

### ARGUMENT

"To bring a claim under the APA, a plaintiff must satisfy Article III's standing requirements

---

[1] As detailed in Defendants' opening brief, Plaintiffs challenge the issuance by HHS of a notification stating that it would not enforce certain non-discrimination provisions relating to non-federal entities that receive grants from HHS, while the agency sought to amend such regulations.

(constitutional standing) and assert interests that are arguably within the zone of interests to be protected or regulated by the statute she claims was violated (statutory standing)." *Salazar v. King*, 822 F.3d 61, 73 (2d Cir. 2016). As set forth in Defendants' opening brief, the allegations in the Complaint fail to demonstrate either constitutional standing or statutory standing, and Plaintiffs' arguments to the contrary are unsupported by the case law.

### A.    Article III Standing

The doctrine of constitutional standing requires that a plaintiff have "a personal stake in the outcome of the controversy [so] as to warrant his invocation of federal-court jurisdiction." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "First and foremost," a plaintiff must allege an "injury in fact – a harm suffered by the plaintiff that is concrete and actual or imminent, not conjectural or hypothetical." *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 103 (1998) (internal quotations omitted). Here, Plaintiffs fail to establish this cognizable injury in fact.

Plaintiffs make three arguments in support of their assertion of standing, none of which are persuasive. First, they argue that "the Notice impairs Plaintiffs' efforts to train grant recipients on their legal obligations . . . and to educate program participants on their rights . . . by creating substantial confusion around those legal obligations and rights." Pls. Br. at 10 (internal citations omitted). Plaintiffs assert they "have already diverted resources to hundreds of hours of work on education and outreach campaigns to ensure that program participants understand the full impact of HHS's nonenforcement action and that grant recipients understand their existing obligations not to discriminate." Pls. Br. at 10. But, as explained in Defendants' opening brief, the notice does not interfere with Plaintiffs' efforts, and the supposed diversion of resources is nothing more than a continuation of the organizations' ordinary activities. *See* Defs. Br. 8-12.

Contrary to Plaintiffs' arguments, the Second Circuit's decision in *New York v. United States Department of Homeland Sec.* ("*New York v. DHS*"), No. 19-3591, 2020 U.S. App. LEXIS

24492 (2d Cir. Aug. 4, 2020), does not support their position.  First, the holding in *New York v. DHS* was expressly based upon the Second Circuit's conclusion that the organizational plaintiffs in that suit had not "merely altered the subject matter of their existing outreach work."  *Id.* at 27. Instead, the court observed that the organizational plaintiffs "provid[ed] an array of legal and social services to non-citizens" and identified specific programmatic changes to those services that satisfied the plaintiffs' burden to demonstrate an injury-in-fact.  *Id.*  For instance, the court found it significant that one organization anticipated that its representation of non-citizens would now require the involvement of an attorney (as opposed to only a paralegal) and require in-person representation at interviews.  *Id.* at 29.  The court also repeatedly emphasized the complexity of the challenged rule and the effect this complexity would have on the plaintiff organization's ability to provide services.  *Id.* at 27 ("The complexities of the Rule required Catholic Charities to change its educational outreach from group sessions to time-intensive individual meetings and to institute a series of evening phone banks.").

Unlike the organizational plaintiffs in *New York v. DHS*, Plaintiffs can only point to an effect on the subject matter of their educational efforts.  Specifically, Plaintiffs assert that, whereas before their educational efforts encompassed the provisions of the 2016 Grants Rule, the Notice of Nonenforcement left "only a patchwork of nondiscrimination protections provided by the underlying statutes" and that they "have had to respond . . . with new and expanded education campaigns."  Pls. Br. at 12.[2]  Plaintiffs ignore, however, that their advocacy activities and that the core of their work have stayed fundamentally the same.  Unlike the Plaintiffs in *New York v. DHS*, Plaintiffs here make no allegations of changes to the type of staffing they would need to serve their

---

[2] Each Plaintiff identifies one federal grant program that is relevant to its mission.  Family Equality asserts it interests align with Title IV-E of the Social Security Act; True Colors United refers to the Runaway and Homeless Youth Act, and SAGE to the Older Americans Act.  Pls. Br. at 18.

mission, nor to the process and procedure they must follow, nor expenses.  Plaintiffs thus do not

allege the sort of harm the Second Circuit concluded existed in *New York v. DHS* or in other cases

finding organizational standing.  Moreover, in *New York v. DHS*, the complexity of the rule at issue

played a significant role in the court's holding.  The Notice of Nonenforcement, in contrast, plainly

lacks this complexity.  It simply declares that Defendants' will not enforce the 2016 Grants Rule

pending repromulgation.  It does not impose any new or potentially difficult to apply requirements

on anyone.

Nor do the other cases Plaintiffs rely upon support their position.  Rather, in each such case,

the courts concluded that the organizations had identified a specific social service provided by the

organization that had been impeded in some concrete way or for which the organization had been

compelled to divert resources to provide the same level of services.  *See, e.g.*, *Havens Realty Corp.*

*v. Coleman*, 455 U.S. 363, 379 (1982) (plaintiff's ability to provide counseling and referral services

to low-income home-seekers was impaired by corporation's racially driven steering practices);

*Centro De La Comunidad Hispana De Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d

Cir. 2017): (plaintiff's ability to speak with, and provide services, to day laborers impaired by

municipality's policy that sought to disperse day laborers from certain locations); *Olsen v. Stark*

*Homes, Inc.*, 759 F.3d 140, 158 (2d Cir. 2014) (among other things, the plaintiff alleged it "prepared

and pursued housing discrimination complaints on behalf of the [individuals]," requiring it to divert

resources from other advocacy and counseling activities); *Common Cause/New York v. Brehm*, 432

F. Supp. 3d 285, 309 (S.D.N.Y. 2020) (plaintiff "held trainings, spent substantial energy assisting

voters, hired new staff, and conducted a large-scale survey directly in response to New York's

laws"); *De Dandrade v. United States Dep't of Homeland Sec.*, 367 F. Supp. 3d 174, 181-82

(S.D.N.Y. 2019) (concluding plaintiffs had standing to challenge the agency's practices where the

practices caused the organization's attorneys to spend more time serving their clients, including

attending interviews that otherwise did not require an attorney.); *Brooklyn Ctr. for Indep. of the Disabled v. Bloomberg*, 290 F.R.D. 409, 417 (S.D.N.Y. 2012) (concluding two organizations challenging whether New York City's emergency preparedness plans adequately addressed the needs of people with disabilities, had standing, as "both organizations have expended considerable resources counseling constituents, gathering and coordinating information, and documenting problems with the City's plans.").

Here, however, Plaintiffs do not identify any such hindrance of their activities. Rather, they have articulated their disagreement with the Notice of Nonenforcement and an intention to continue to educate grant recipients on their legal obligations, and to educate program participants on their rights. However, "an organization whose primary endeavor is to change or enforce the law, whether by communicating directly with government officials, community leaders, or the public, occupies no position different from that of a concerned citizen" and therefore cannot demonstrate standing to challenge policy with which it disagrees. *Young Advocates for Fair Educ. v. Cuomo*, 359 F. Supp. 3d 215, 235 (E.D.N.Y. 2019) (further observing that "if the Court were to accept [plaintiff's] argument, it would be difficult to conceive of a case in which an organization or individual would *not* have standing to challenge a statute that they find politically or socially disagreeable.") (emphasis in original); *see also Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 486 (1982) ("[S]tanding is not measured by the intensity of the litigant's interest or the fervor of his advocacy."). Moreover, particularly as each of these Plaintiffs asserts that they focus on a particular grants program – Title IV-E of the Social Security Act in the case of Family Equality, the Runaway and Homeless Youth Act in the case of True Colors United, and the Older Americans Act in the case of SAGE – it is unclear how any alleged "patchwork of nondiscrimination protections provided by the underlying statutes" could lead to confusion amongst the relevant grant recipients and program recipients.

Second, in their opposition brief, one of the Plaintiffs – True Colors United – argues that the Notice of Nonenforcement "eliminate[s] its ability to teach service providers the importance of not discriminating against homeless LGBTQ youth by relying on the 2016 Grants Rule as a training tool."  Pls. Br. at 13.  True Colors argues that it has been forced to "divert hundreds of hours of staff time to replac[e] the defunct federal standards."  Pls. Br. at 13 (internal quotations omitted).  This argument is meritless.  Not only does True Colors fail to explain how a regulation of any sort would "eliminate" their ability to teach anyone about the importance of not discriminating against homeless LGBTQ youth, the argument ignores the fact that the Runaway and Homeless Youth Act contains equivalent anti-discrimination provisions as those set forth in the 2016 Grants Rule.  *See* 45 C.F.R. 1351.22(a).

Lastly, two of the Plaintiffs – True Colors United and SAGE – argue that the Notice of Nonenforcement "serve[s] as an explicit invitation to discriminate" and thereby impedes their activities.  Pls. Br. at 14.  Not only do Defendants disagree with this characterization of the Notice of Nonenforcement, Plaintiffs' arguments here are no different from the flawed analysis asserted in their first argument.  Again, Plaintiffs argue that they have been compelled to engage in additional efforts to educate state policymakers and service providers and "to devote resources to combatting the effects of a law that is harmful to their missions."  Pls. Br. at 14; *see also* Pls. Br. at 15 (asserting that SAGE is "redoubl[ing] its efforts to reach service providers directly and educate them on the importance of providing safe and inclusive services . . . which has also diverted time and effort away from its other ongoing projects").  But, as discussed above, disagreement with the Notice of Nonenforcement and an intention to continue to educate grant recipients on their legal obligations and to educate program participants on their rights are activities which cannot confer standing.  While the D.C. Circuit's opinion in *Ctr. for Law & Educ. v. Dep't of Educ.* – in which the court held that an organization did not have standing despite alleging it was compelled to change its

6

method of "address[ing] advocacy issues [to] an expensive State-by-State basis," 396 F.3d 1152,

1158, 1161-62 (D.C. Cir. 2005) – is not binding on this Court, it does provide a source of persuasive

reasoning.  *See Young Advocates for Fair Educ.*, 359 F. Supp. 3d at 234 ("the District of Columbia

Circuit, which hears numerous challenges to federal power by interested lobbying groups and

therefore may be regarded as a persuasive authority in this area of law.")  As the D.C. Circuit

observed, Plaintiffs' allegations that they will now incorporate state-level work into their

educational and outreach efforts, as opposed to federal, is similarly insufficient to establish

standing.

### B.    Statutory Standing

Not only do Plaintiffs lack Article III standing, they also lack statutory standing.  Statutory

standing requires that a "plaintiff's complaint fall within 'the zone of interests to be protected or

regulated by the statute or constitutional guarantee in question.'"  *Valley Forge*, 454 U.S. at 474-75

(quoting *Association of Data Processing Service Orgs. v. Camp*, 397 U.S. 150, 153 (1970)).

"Whether a plaintiff comes within 'the 'zone of interests' is an issue that requires [the court] to

determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause

of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control

Components, Inc.*, 572 U.S. 118, 127 (2014).  A court "do[es] not ask whether . . . Congress should

have authorized [a plaintiff's] suit, but whether Congress in fact did so."  *Id.* at 128.  Although this

test "is not meant to be especially demanding," a plaintiff does not fall within the zone of interests if

its interests are "so marginally related to . . . the purposes implicit in the statute that it cannot

reasonably be assumed that Congress intended to permit the suit."  *Clarke v. Sec. Indus. Ass'n*, 479

U.S. 388, 399 (1987).[3]

---

[3] As Plaintiffs note, a motion to dismiss for failure to fall within the zone of interests is properly
brought pursuant to Rule 12(b)(6), not Rule 12(b)(1).

Here, Plaintiffs do not fall within the "zone of interests" of the grant programs they reference, such as those established by Title IV-E of the Social Security Act, the Older Americans Act, or the Runaway and Homeless Youth Act.[4]  These programs protect the rights and interests of individuals, not advocacy organizations, let alone the interests those organizations have in the efficient use of their resources.  Such interests are "so marginally related to . . . the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."  *Sec. Indus. Ass'n*, 479 U.S. at 399.

In their opposition brief, Plaintiffs take the position that, because their missions align with the purposes of the grants programs in some ways, they are within the zone of interests of those statutes.  For instance, Plaintiff Family Equality asserts that it is "squarely within the zone of interests of Title IV-E" because its "interest in this litigation stems from its mission-driven work to ensure that adoption and foster care services are safe for LGBTQ youth."  Pls. Br. at 18 (internal quotations omitted).  Family Equality argues that, since Title IV-E "requires states to comply with federal standards to improve outcomes for children in the foster care and adoption system," *id.* (citing 42 U.S.C. § 671, and its mission is "entirely consistent with these purposes," *id.*, it has standing.  True Colors similarly asserts that it falls within the zone of interests of the Runaway and Homeless Youth Act because its "interest in this lawsuit relates to its mission-driven work to ensure that homelessness services are safe for LGBTQ youth," and that the purpose of the Runaway and Homeless Youth Act is consistent with this mission.  *Id.*  And SAGE asserts that it falls within the

---

[4] Title IV-E of the Social Security Act was established "[f]or the purpose of enabling each State to provide . . . foster care and transitional independent living programs for children who otherwise would have been eligible for assistance under the State's plan[,] . . . adoption assistance for children with special needs, kinship guardianship assistance, and prevention services or programs[.]"  42 U.S.C. § 670.  The objectives of the Older Americans Act, 42 U.S.C.§ 3001 *et seq.*, include the provision of services to individuals who are 60 years of age or older.  *Id.*  The Runaway and Homeless Youth Act seeks to provide services to young people who have become homeless.  *See* 34 U.S.C. § 11201.

zone of interests of the Older Americans Act because the organization's "interest in this litigation stems from its mission-driven work to ensure that LGBTQ older people are able to age with dignity." *Id.* (internal quotations omitted).

Plaintiffs' arguments, however, ignore the basic function of the zone of interests test. The test does not ask whether *Plaintiffs* have placed themselves within the zone of interest of a particular statute by establishing an organizational mission that overlaps with the purpose of a statute. Rather, the question is whether *Congress* authorized such a suit. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 (2014) (The zone of interests test "do[es] not ask whether . . . Congress should have authorized [a plaintiff 's] suit, but whether Congress in fact did so."). "Whether a plaintiff comes within 'the 'zone of interests' is an issue that requires [the court] to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Id.* at 127. An organizational plaintiff thus cannot create standing for itself simply by aligning its mission with the purpose of a statute, in the absence of some indication that Congress intended to confer standing on the organization. And merely because an organization's goals are aligned in some ways with the policies reflected in a specific statutory scheme does not place the organization within the statute's zone of interests for the purposes of standing.

Plaintiffs also argue that the Court should look to the zone of interests encompassed by the 2016 Rule, rather than the grants statutes, in determining whether they have standing. Specifically, Plaintiffs assert, "[t]he interests of each of the three Plaintiffs in this litigation stem from their missions to ensure that LGBTQ families, youth, and elders are free from the very discrimination prohibited by the regulations." Pls. Br. at 17. Relying on *New York v. DHS*, 2020 WL 4457951 at *12, Plaintiffs argue that they are, therefore, "among those who in practice can be expected to police the interests that the regulations protect," Pls. Br. at 17, and accordingly have standing.

9

As an initial matter, it is the authorizing statute, not any regulation that may be promulgated under the statute, that sets forth the relevant zone of interests for *statutory* standing. As noted, the inquiry asks whether "plaintiff's complaint fall[s] within the zone of interests to be protected or regulated *by the statute or constitutional guarantee in question*," *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 474-75 (1982) (internal quotations omitted) (emphasis added).[5]  But, even assuming for purposes of argument that the 2016 Rule provides the relevant zone of interests, it has no bearing on the outcome here.  As with the statutes addressed above, Plaintiffs' assertion that they have aligned their missions with the policies reflected in the 2016 Grants Rule is alone insufficient to confer statutory standing.

### C.     A Stay of This Action Is Warranted

As set forth in Defendants' opening brief, "the decision whether to issue a stay is . . . firmly within a district court's discretion.'"  *LaSala v. Needham & Co., Inc.*, 399 F. Supp. 2d 421, 427 (S.D.N.Y. 2005) (quoting *Am. Shipping Line v. Massan Shipping*, 885 F. Supp. 499, 502 (S.D.N.Y. 1995)).  Although HHS cannot give a definitive estimate on when the rule will be issued, a stay is within this Court's discretion to conserve resources, particularly as the promulgation of the final rule is expected to render the challenged notice in this case moot.

### CONCLUSION

For the reasons set forth above and in Defendants' opening brief, this Court should grant Defendants' motion to dismiss the Complaint, or, in the alternative.

---

[5] Plaintiffs cite to *Fed. Defs. of N.Y., Inc. v. Fed. Bureau of Prisons*, 954 F.3d 118 (2d Cir. 2020), in support of their argument that the regulation itself informs the zone of interests test.  However, the Second Circuit's decision in that case, holding simply that "when an aggrieved party invokes the APA's right to sue an agency for failing to adhere to its own valid regulations, the zone-of-interests inquiry . . . should focus on the regulations that were allegedly violated" *id.* at 131, is inapplicable here.  Specifically, Plaintiffs do not allege any violation of the 2016 Rule that would make that regulation relevant to the zone of interests test.

Dated: New York, New York
September 2, 2020

Respectfully submitted,

AUDREY STRAUSS
Acting United States Attorney of the
Southern District of New York

By: _____
JENNIFER C. SIMON
Assistant United States Attorney
86 Chambers Street, Third Floor
New York, New York 10007
Tel.: (212) 637-2746
E-mail: Jennifer.Simon@usdoj.gov

11