UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/30/2022

FAMILY EQUALITY; TRUE COLORS UNITED,
INC.; and SERVICES & ADVOCACY FOR GLBT
ELDERS,

                          Plaintiffs,

            -against-

XAVIER BECERRA, in his official capacity as
Secretary, United States Department of Health and
Human Services; and THE UNITED STATES
DEPARTMENT OF HEALTH AND HUMAN
SERVICES,

                       Defendants.

1:20-cv-2403 (MKV)

**OPINION AND ORDER
GRANTING MOTION TO
DISMISS**

MARY KAY VYSKOCIL, United States District Judge:

       This case derives from a final rule promulgated by HHS in 2016 that espoused "a public

policy requirement" that "no person otherwise eligible w[ould] be excluded from participation

in, denied the benefits of, or subjected to discrimination in the administration of HHS programs

and services based on non-merit factors such as age, disability, sex, race, color, national origin,

religion, gender identity, or sexual orientation."  81 Fed. Reg. 89393-95 (Dec. 12, 2016)

(codified at 45 C.F. R. § 75.300) ("2016 Grants Rule").  Plaintiffs Family Equality, True Colors

United, Inc., and Services & Advocacy for GLBT Elders ("SAGE") (collectively, "Plaintiffs")

filed this action asserting a violation of the Administrative Procedures Act after the Department

of Health and Human Services ("HHS") announced that it would no longer enforce certain

provisions of the 2016 Grants Rule.  Complaint ¶ 1 [ECF No. 1]; 84 Fed. Reg. 63809 ("Notice of

Non-Enforcement").  Defendants Alex Azar II,[1] in his official capacity as the Secretary of the

---

[1] Secretary of the Department of Health and Human Services Xavier Becerra, in his official capacity, has now been automatically substituted as a Defendant pursuant to F.R.C.P. 25(d).

Department of Health and Human Services, and HHS moved to dismiss the Complaint for lack of standing and for failure to establish that Plaintiffs were within the zone of interests of any at-issue statute or regulation.  Defendants' Motion to Dismiss [ECF No. 40]; Defendants' Memorandum in Support [ECF No. 41] ("Defs.' Mem.").  Plaintiffs filed their Opposition to the Motion to Dismiss [ECF No. 42] ("Pls.' Opp."), and Defendants filed their Reply [ECF No. 43] ("Defs.' Reply").

In January 2021, the Court received a letter from Defendants [ECF No. 48] and Plaintiffs [ECF No. 50] advising that a pending final rulemaking could roll back the 2016 Grants Rule.  Per the joint request of the Parties, this case was stayed in February 2021 pending the effective date of that anticipated new rule.  [ECF No. 51].  The proposed new rulemaking was then challenged in a different action in the United States District Court for the District of Columbia.  *See Facing Foster Care in Alaska, et. al., v. HHS, et. al.*, Civ. No. 21-cv-308 (D.D.C. Feb. 2, 2021) ("*Facing Foster Care*").  In *Facing Foster Care*, Defendants stipulated that the effective date of the pending rulemaking would be extended to August 2021.  *See* Joint Letter dated Feb. 16, 2021 [ECF No. 52].  This Court then further stayed this case in light of *Facing Foster Care* and Executive Orders that directed agency heads to review all agency actions inconsistent with a policy of preventing discrimination.  [ECF No. 53].  In a joint letter filed on May 3, 2021, the Parties asked that the Court lift the stay in this case, which the Court did.[2]  [ECF No. 56].  The United States District Court for the District of Columbia subsequently further stayed through April 18, 2022 the effective date of the pending final rulemaking that would rescind the 2016

---

[2] In their moving papers, Defendants sought to stay the case pending the outcome of this final rulemaking.  Defs.' Mem. at 14-15.  Given the Parties prior joint request that the stay be lifted and joint statement that no further developments will impact the ability to decide the Motion, the Court does not consider whether a stay is further warranted in this case.

Grants Rule.  *See Facing Foster Care in Alaska, et. al., v. HHS, et. al.*, Civ. No. 21-cv-308, ECF No. 30.

The Court will decide this Motion because there is a live controversy given the stay of the rulemaking that would roll back the 2016 Grants Rule.  However, the Court notes that this case may quickly become moot depending on the outcome of the case in the District Court for the District of Columbia.

For the reasons explained below, Defendants' Motion to Dismiss is GRANTED.

## **BACKGROUND**

In November 2019, HHS issued a Notice of Non-Enforcement that stated it would no longer enforce the 2016 Grants Rule.  84 Fed. Reg. 63809 (Nov. 19, 2019).  In issuing the Notice of Non-Enforcement, HHS stated it had "significant concerns" that the 2016 Grants Rule did not comply with the Regulatory Flexibility Act.  81 Fed. Reg. 63809.

Plaintiffs are three different community outreach organizations that work with LGBTQ-identifying groups.[3]  Plaintiff Family Equality works to "advance legal and lived equality for LGBTQ families" through community outreach intended to educate LGBTQ families about their rights.  Compl. ¶¶ 9-10.  Family Equality also engages in federal- and state-level lobbying to "ensure that adoption and foster care services do not discriminate against" LGBTQ individuals.  Compl. ¶ 10.  Plaintiff True Colors United seeks to "implement innovative solutions to youth homelessness that focus on the unique experiences of LGBTQ young people."  Compl. ¶ 12.  True Colors United offers training and education designed to "ensure that LGBTQ youth experiencing homelessness have access to safe and supportive services."  Compl. ¶ 13.  Like Family Equality, True Colors United also engages in "lobbying at 'federal, state and local levels

---

[3] The Court adopts the language that Plaintiffs use to describe their constituents.  *See* Compl. ¶ 5.

to promote funding and support related to all aspect of" their members' identities.  Compl. ¶ 13.

Finally, Plaintiff SAGE is "a national advocacy and services organization whose mission is to

allow LGBTQ older people to age with respect and dignity."  Compl. ¶ 16.  SAGE provides

training and educational services, in addition to services through which "LGBTQ older people

may obtain meals, access social and cultural programming, and gain assistance with obtaining a

variety of aging services."  Compl. ¶ 16.

Each Plaintiff claims that it relied on the non-discrimination requirements of the 2016

Grants Rule to help accomplish their objectives of promoting non-discrimination and providing

services to its respective constituent members.  *See* Compl. ¶¶ 11, 14, 17.  Plaintiffs allege that

the Notice of Non-Enforcement "guts" the policy of non-discrimination from the 2016 Grants

Rule.  Compl. ¶ 15.  Specifically, Plaintiffs maintain that the Notice of Non-Enforcement is a

substantive, binding rule within the meaning of the APA that was promulgated without notice

and comment procedures, and is arbitrary and capricious.  *See* Compl. ¶¶ 53-58.  This Court

answers the only question currently before it as framed by the pending Motion to Dismiss:

whether Plaintiffs have standing to bring suit.

## DISCUSSION

## I.   LEGAL STANDARD FOR ARTICLE III STANDING

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of a claim for lack of subject

matter jurisdiction if a plaintiff fails to allege adequate facts that establish constitutional standing

under Article III.  *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 416-17 (2d

Cir. 2015).  Article III of the Constitution "limits federal courts to deciding 'Cases' and

'Controversies.'"  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2565 (2019); U.S. Const.

art. III, § 2.  This basic requirement dictates that "at least one plaintiff must have standing to sue."  *Dep't of Commerce*, 139 S. Ct. at 2565.

The Supreme Court has "established that the 'irreducible constitutional minimum' of standing consists of three elements.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Id.*

"To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan*, 504 U.S. at 560).  The "injury-in-fact" requirement is "a low threshold, which helps to ensure that the plaintiff has a personal stake in the outcome of the controversy."  *John v. Whole Foods Mkt. Grp.*, 858 F.3d 732, 736 (2d Cir. 2017) (internal quotation marks omitted).  There must be a causal connection between the alleged injury and the complained-of conduct.  *Lujan*, 504 U.S. at 561.  This connection must be "fairly traceable," a standard "lower than that of proximate cause."  *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013).  It must also be more than "merely speculative" that plaintiff's "injury will be redressed by a favorable decision."  *Id.*  The plaintiff bears the burden of establishing standing "as the party invoking federal jurisdiction."  *Id.*

An organization may have Article III standing in one of two ways.  An organization may have associational standing to sue on behalf of its members if one member of the organization has standing to bring the suit individually.  *NY Civil Liberties Union v. NYC Transit Auth.*, 684 F.3d 286, 294 (2d Cir. 2014).  Alternatively, and at issue here, an organization "may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever

rights and immunities the association itself may enjoy." *Warth v. Seldin*, 422 U.S. 490, 511 (1975). "Under this theory of 'organizational' standing, the organization is just another person– albeit a legal person–seeking to vindicate a right." *NY Civil Liberties Union*, 684 F.3d at 294. The standing test applies to organizations in the same way it applies to individuals; that is, the organization must show an "actual or threatened injury in fact that is fairly traceable to the alleged illegal action and likely to be redressed by a favorable court decision." *Irish Lesbian & Gay Org. v. Giuliani*, 143 F.3d 638, 649 (2d Cir. 1998) (internal quotation marks omitted). And where, as here, "multiple parties seek the same relief, 'the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement.'" *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) ("*Centro de la Comunidad*") (quoting *Rumsfeld v. Forum of Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)).

For purposes of Article III standing, "an organization must demonstrate a 'perceptible impairment' of its activities sufficient to meet the 'injury-in-fact' requirement" by showing *either* "that a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities" *or* that it has "divert[ed] its resources away from its current activities." *Centro de la Comunidad*, 868 F.3d at 110-11 (internal quotation marks and alterations omitted).

In *Moya v. United States Department of Homeland Security*, the Second Circuit "reiterated" that "where an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing," and that only a "perceptible impairment is required." 975 F.3d at 129 (quoting *Centro de la Comunidad*, 975 F.3d at 129). *Moya*, and the cases it relied upon, left

some lack of clarity[4] with respect to organizational standing requirements.  The most recent pronouncement by the Second Circuit on organizational injury for standing purposes has provided some clarification, and holds that where "an organization is not directly regulated by a challenged law or regulation, it cannot establish a 'perceptible impairment' absent an involuntary material burden on its established core activities."  *Connecticut Parents Union v. Russell-Tucker*, 8 F.4th 167, 173 (2d Cir. 2021).

## II.    PLAINTIFFS DO NOT ESTABLISH ARTICLE III STANDING

Defendants maintain that Plaintiffs lack Article III standing because they "fail to establish a cognizable injury in fact" and instead proffer only "a policy disagreement with the challenged Notice of Nonenforcement."  Defs.' Mem. at 7; Defs.' Reply at 2.  Plaintiffs allege that there has been a "perceptible impairment" of their organizational activities as a result of a diversion of resources because they have diverted significant manpower and time in responding to the Notice of Non-Enforcement.  *See* Compl. ¶¶ 79, 87, 92.  Defendants propound that Plaintiffs simply continue to engage in activities that they pursued before the Notice of Non-Enforcement, which, in their view, is insufficient to establish an injury-in-fact.  Defs.' Mem. at 10.  The Court agrees that Plaintiffs have not made out a *prima facie* showing of standing.

### i.   *Plaintiffs Have Not Suffered an Involuntary Material Burden on Established Core Activities*

Under Second Circuit authority, a diversion of resources for injury purposes may be to activities already part of an organization's usual services.  *Moya*, 975 F.3d at 130 (rejecting argument that no diversion existed because "navigating the immigration laws is [the organization's] current activity."); *see also De Dandrade v. DHS*, 367 F. Supp. 3d 174, 182

---

[4] *Moya v. DHS*, 975 F.3d 120, 137 (2d Cir. 2020) (Jacobs, J, concurring) (disagreeing with majority interpretation of organizational standing requirement and writing that "*Centro* needs clarification.").

(S.D.N.Y. 2019) ("It is of no consequence that part of the diversion of resources is to . . . activities that are already part of the organization's usual services."). Indeed, Defendants' own authority underscores this statement of the law. *Centro de la Comunidad* involved a town ordinance that sought to limit the solicitation of employment by people approaching cars next to public rights-of-way. 868 F.3d at 107; Defs. Mem. at 10 (citing *Centro de la Comunidad*). The plaintiff was an organization that sought to end the exploitation of Latino immigrant workers, and alleged that the ordinance would require it to "divert resources from other of its activities to combat the effects of the [o]rdinance." *Id.* at 110. In *Centro de la Comunidad*, the Second Circuit identified "three ways in which the entity's core activities were burdened:" 1) "the ordinance would require the physical dispersal of laborers, which would impede organizing activity, one of the entity's primary 'responsibilities,'" 2) "the entity would have to 'divert resources from other of its activities to combat the effects of the [challenged] [o]rdinance, *i.e.* the entity would have to expend additional resources to continue organizing after the forced dispersal of the laborers," and 3) "the entity's members would face the risk of 'erroneous arrest' while conducting 'advocacy activities' among the laborers." *Connecticut Parents Union*, 8 F.4th at 174 (alterations in original) (quoting *Centro de la Comunidad*, 868 F.3d at 109-110).

Each Plaintiff here claims that, because of the Notice of Non-Enforcement, it will be forced to undertake new projects such as reforming and adjusting their outreach services, all while continuing their goals of providing services to LGBTQ individuals. Plaintiff True Colors United has been engaged in educational services that relate to the importance of refraining from discriminating against LGBTQ youth. Compl. ¶ 83. True Colors United claims that, as a result of the Notice of Non-Enforcement, its efforts will be "less effective," and it will have to examine state-level protections, rather than previously promised federal protection. Compl. ¶ 83. At the

time of the Complaint, this required "135 hours of staff time" to examine just three state's regulations, including "8 phone calls," "5 trips for in person meetings, and spending several hours in preparation for those meetings."  Compl. ¶ 84.

Plaintiff Family Equality contends that the Notice of Non-Enforcement impedes "its ability to ensure that foster care and adoption services are safe" because it has introduced "substantial confusion" regarding the legal obligations of grant recipients.  Compl. ¶¶ 77-78. Accordingly, Family Equality has engaged in a "widespread and comprehensive education and outreach campaign to ensure that LGBTQ youths and families understand the full impact of HHS's nonenforcement action."  Compl. ¶ 79.  This has resulted in "approximately 40 hours of staff time assessing the legal effect of the Notice of Nonenforcement," working to "identify and understand the anti-discriminations left in place," and in total "well over 170 hours of staff time responding to the Notice of Nonenforcement through its public outreach and education campaign."  Compl. ¶¶ 79-80.  Notwithstanding its work to date, Family Equality asserts it has been injured because its "efforts to prevent discriminatory state legislation will be less effective." Compl. ¶ 81.

Similarly, SAGE has been forced to "obtain state-level protections to fill the gap left by HHS's now-abandoned non-discrimination protections," which has resulted in its team spending "more than 20 hours designing a proposed new program to research and educate state policymakers on the need for state-level protections," in addition to time spent on an education and outreach campaign.  Compl. ¶¶ 91-92.

However, accepting these allegations as true, Plaintiffs here, unlike the plaintiffs in *Centro de la Comunidad*, have not suffered an *involuntary* burden on established core activities. Under binding precedent, "expenditures or other activities if incurred at the organization's own

initiative[] cannot support a finding of injury." *Connecticut Parents Union*, 8 F.4th at 173-174. Accordingly, "an organization's decision to embark on categorically new activities in response to action by a putative defendant will not ordinarily suffice to show an injury for standing purposes, even if the organization's own clients request the change." *Id.* at 174. Just as in *Connecticut Parents Union*, Plaintiffs here do not "identify any restrictions on its ability to perform the core activities" it previously engaged in, such as education, outreach, lobbying, "meetings, lectures, and general organizing." *Id.* at 175. To be sure, Plaintiffs allege that they have incurred expense by reacting to the Notice of Non-Enforcement. *See, e.g.*, Compl. ¶¶ 79-80, 84, 91-92. But those reactions are not an involuntary result of "increased demand for services," *NY v. DOH*, 969 F.3d 42, 60-61 (2d Cir. 2020), or taken to "continue organizing" and advocating, *Centro de la Comunidad*, 868 F.3d at 110. Instead, they are activities the Plaintiffs pursued "at their own initiative" in response to the Notice of Non-Enforcement, which harms their "abstract social interests." *Connecticut Parents Union*, 8 F.4th at 173-74. At bottom, an organization cannot establish standing "by claiming to have been injured by any law or regulation touching any issues within the scope of its mission . . . so long as it expends resources to oppose that law or regulation." *Connecticut Parents Union*, 8 F.4th at 173. Plaintiffs here have simply suffered a "setback to [their] organization[s'] abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).

Applying the principles articulated by the Second Circuit, the Court concludes that Plaintiffs have not shown an involuntary and material impact on its advocacy activities.

### ii. *Plaintiffs' Ability to Carry Out Responsibilities Has Not Been Impeded*

As previously stated, an organization may also demonstrate a "perceptible impairment" of its activities sufficient to establish an injury-in-fact by showing "that a policy has impeded, and will continue to impede, the organization's ability to carry out its responsibilities." *Centro de*

*la Comunidad*, 868 F.3d at 110 (quotation and alterations omitted).  Plaintiffs maintain that for various reasons the Notice of Non-Enforcement "conflicts with, impairs, and frustrates" each organization's "mission and activities," and that its advocacy will be "less effective" as a result of the Notice of Non-Enforcement.  *See* Compl. ¶¶ 77, 81-83, 90.  The Court does not agree that Plaintiffs' missions are impeded since each organization plainly continues in the same educational activities and advocacy work it previously undertook.  Accordingly, the Notice of Non-Enforcement does not impede Plaintiffs because Plaintiffs continue to engage in advocacy to ensure that HHS grant recipients do not discriminate against LGBTQ individuals.

*        *        *

In sum, Plaintiffs fail to establish an injury-in-fact, a necessary predicate for Article III standing.  *Spokeo, Inc.*, 578 U.S. at 338.  Accordingly, the Court is without subject matter jurisdiction to adjudicate the dispute.  *In re U.S. Catholic Conference*, 885 F.2d 1020, 1023 (2d Cir. 1989).  Because the Court concludes that Plaintiffs do not have Article III standing to bring this suit, the Court does not reach the question of whether the Plaintiffs fall within the "zone of interests" of a statute or regulation in this case.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED.  Because the Court is without subject matter jurisdiction to adjudicate the dispute, the case is dismissed WITHOUT PREJUDICE.  The Clerk of the Court respectfully is requested to terminate the motion at ECF No. 40 and close the case.

**SO ORDERED.**

Date:   March 30, 2022
       New York, NY

MARY KAY VYSKOCIL
United States District Judge